**People of the State of Illinois, Plaintiff-Appellee, v. George R. Hammond, Defendant-Appellant.**

**Gen. No. 51,113.**

First District, Fourth Division.

October 8, 1969.

Rehearing denied November 14, 1969.

Raymond I. Suekoff, of Chicago (Raymond I. Suekoff, Charles Liebman, and Allen Kanter, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSE CHARGED

Attempt (robbery). Ill Rev Stats (1963), c 38, §§ 8-4 (a), 18-1 (a).

## JUDGMENT

After a trial by jury, Hammond and his two codefendants were found guilty of attempted robbery, and Hammond—the only appellant—was sentenced to a term of 10 to 12 years.

## POINTS RAISED ON APPEAL

(1) Testimony of alleged oral confessions by codefendants was prejudicial to defendant.

(2) The State failed to prove defendant guilty beyond a reasonable doubt.

(3) Trial counsel for defendant was so incompetent as to deny him effective representation.

(4) The State's Attorney's improper conduct deprived defendant of a fair trial.

(5) The trial judge made remarks in front of the jury which were prejudicial to defendant.

## EVIDENCE

George R. Hammond, Roscoe Nelson, and Hezekiah Jackson were indicted for attempting to rob William O'Brien on September 20, 1963. All three defendants were tried together and were represented by the same attorney.

William O'Brien, for the State:

He was a police officer on September 20, 1963, and was on duty with Officers Kodatt and Peebles. He was standing on 63rd Place and his partners were in a car, partially visible, parked around the corner. Three men walked toward him, and two continued by about 40 feet and sat on a railing. The third one (this defendant) walked 5 to 7 feet past, but then turned around and walked up to him, saying, "I would like to commit an act of oral copulation." The witness replied he was not interested, whereupon defendant threatened him by putting a knife to his throat and demanded his money. At that time the other two men were 30 to 40 feet away. They then ran toward him and started striking him, whereupon O'Brien de-

clared he was a police officer and "went for his gun." He succeeded in getting it halfway out when defendant dropped the knife and they all fled. O'Brien pursued, firing two warning shots in the air and a third which hit defendant in the ear, knocking him to the ground where he was placed under arrest, handcuffed, and then taken away in a patrol wagon.

O'Brien returned to the scene of the assault and found a knife on the street. He proceeded to the hospital where stitches were administered for a hand cut received in warding off the knife wielded by defendant. He then went to the police station where he saw Nelson and Jackson in a room with Officers Kodatt and Peebles. Jackson stated, in O'Brien's presence, that he and Nelson, who had been in Chicago only two weeks, wanted money to return to Missouri; that they made an agreement with Hammond that same night to "stick up" someone.

Hammond was brought into the room with the two co-defendants, and they were asked if he was the man who had suggested the robbery. Jackson replied, "Yes, that is the man." Hammond denied it, stating that he was only trying to protect the witness.

The police have no record or memorandum of any confessions made by Jackson.

O'Brien put his own initials on the knife and had kept it in his personal custody during the entire time prior to trial.

Police Officer Edward Kodatt, for the State:

On September 20, 1963, he was on duty with his partners, O'Brien and Peebles. From the vehicle in which he was sitting on Union Avenue, he could see O'Brien on 63rd Place. He saw one man approach O'Brien; then two more approached and began swinging at him. Kodatt got out of the car and ran in the direction of the four men. The three fled and he and his partners pursued, eventually catching all of them. As he and Peebles were walking Jackson and Nelson toward a squadrol, he asked them

350

what they were doing. They replied that they had come from Missouri; that they were broke and needed money to get home on, so they had wanted to rob someone. Jackson said further that he and Nelson had met Hammond and told him they were in dire need of funds, and that thereupon Hammond had suggested, "If you want to go along with me, we'll hit the street and see if we can find some mope to stick up."

His testimony was otherwise substantially the same as O'Brien's pertaining to the alleged confession of Jackson at the police station outside the presence of Hammond. Additionally, according to Kodatt, Jackson stated that when defendants had spotted O'Brien, Hammond had instructed the other two to walk ahead and he would do the talking.

When Hammond was brought into the room with co-defendants, he (Kodatt) asked Nelson and Jackson, "Is this your accomplice?" Nelson remained mute, but Jackson responded that Hammond "was the man that suggested that we rob this fellow." When Hammond was questioned, he stated that he was only trying to help O'Brien.

Police Officer James Peebles, for the State:

The pertinent parts of his testimony are substantially the same as Officer Kodatt's, with the important exceptions that he could not see the incident in question, and he did not testify to having heard Kodatt ask Nelson and Jackson, in Hammond's presence, if the latter had been their accomplice.

George Hammond, defendant, on his own behalf:

He is 27 years old, married and the father of two children, and has been employed as a punch press operator for the last five years by International Harvester. He also is a landlord of the building he owns which houses two tenants. On September 20, 1963, he had received his pay from work and had also collected rent.

351

That evening, he left home to have a drink with a friend, L. C. Melchor. After having a few drinks, he was walking toward his car to go home when he saw Officer O'Brien standing on the corner, with a large cowboy hat on, weaving as if he were drunk. Standing near him were the two codefendants and another fellow who soon proceeded down the street past O'Brien. Hammond watched this, then passed by O'Brien and said, "For a moment there, I thought those fellows was trying to rob you." O'Brien then pulled a gun and told the witness to put his hands up. The witness was then hit from behind and fell, whereupon someone started kicking him. He jumped up and tried to run, but was apprehended.

He testified that he had never seen Nelson and Jackson before that night, and that he did not struggle with O'Brien, nor had he ever seen the knife admitted into evidence. All three defendants were "worked over" in the police station, but what he told the police at that time was the same as the testimony he gave in court. He did not recall that Jackson had made the alleged statements at the police station or in the squadrol, or that Nelson and Jackson had told him they needed money to go to Missouri.

Nancy Bridges, for the defense:

She had known the defendant since 1942 when he lived near her, and attested to his good reputation in the community for being an honest, truthful and law-abiding citizen.

Annetta Eckles, for the defense:

She lives next door to defendant and had known him a little over a year, and attested to his good reputation in the community for being an honest, truthful and law-abiding citizen.

Ruth Hammond, for the defense:

She is defendant's wife, and stated that he has never carried nor owned a knife during their marriage.

Freddie M. Brown, for the defense:

She is defendant's mother, and had never seen him carry a knife.

Roscoe Nelson, on his own behalf:

He was 17 years old at the time in question, and was at 63rd Place and Union with Jackson and another man whose name he didn't know. The unknown man left, and Jackson and the witness walked past O'Brien, who was "staggering like he was drunk," and past Hammond, who was further down the street. When they got to the corner, he heard O'Brien scream, and he turned around to see O'Brien with a gun pointed at Hammond. Rather than become involved, he and Jackson left the scene and became separated. Later, he was arrested and put in the police wagon with Hammond and Jackson.

Witness denied making any confession, and denied that Jackson had made any confession or admission in his presence. He told the police he didn't even know Hammond. (There was no evidence that Nelson and Jackson, who were friends, had ever seen Hammond before, or vice versa.)

Hezekiah Jackson, on his own behalf:

As to the incident in question, his testimony was substantially similar to Nelson's except that he was arrested first and led the police to the place where Nelson was staying.

He denied making the statements attributed to him by the officers. He was asked to confess, but told the police he knew nothing to tell them. He was 20 years old at the time.

OPINION

■ Defendant Hammond contends that multiple trial situations such as this case involving the trial of three persons accused of the same crime, represented by the same attorney, must be treated with extreme caution to insure the protection of each defendant's rights, particularly where, as here, there was testimony concerning an

alleged oral confession by a codefendant. We agree with this principle. The trial court must be aware of the peculiar problems of the case and be prepared to prevent the occurrence of harmful error. The case at bar therefore requires careful analysis of the record to determine whether the conduct of the trial resulted in such error.

█ Officer O'Brien testified that the defendant Jackson inculpated defendant by making an oral confession. Defense counsel objected to this testimony on the ground that Hammond had not been present at the time. The objection was overruled. The trial judge, however, orally admonished the jury that this testimony was to be disregarded as to Hammond. O'Brien also stated that Hammond subsequently came into the room with the other defendants and was then confronted with the confession. Hammond denied his participation in any crime, stating that he was only trying to protect O'Brien whom he thought was being robbed.

O'Brien's testimony pertaining to the alleged confession was partially corroborated by the testimony of Officers Kodatt and Peebles. Their testimony was also duly objected to by defense counsel and the same oral cautionary instructions were given. This procedure would have followed generally the law as set out in Delli Paoli v. United States, 352 US 232, and a line of Illinois cases (see People v. White, 28 Ill2d 23, 26, 190 NE2d 817; and People v. Carver, 77 Ill App2d 247, 257–259, 222 NE2d 17) ; however, the rule of those cases was reversed in Bruton v. United States, 391 US 123.

Bruton involved a situation in which a codefendant's extrajudicial confession inculpating the defendant was admitted over objection. Despite both an oral admonition and a written cautionary instruction, this was held to violate the defendant's sixth-amendment right to confront witnesses against him. The Supreme Court stated at page 137:

Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

The State attempts to distinguish Bruton on the ground that here the alleged confessor (Jackson) took the witness stand in his own behalf (permitting confrontation), whereas in Bruton he did not. We consider that this distinction does not cure the basic problem because in the instant case we must also concern ourselves with the fact that in his testimony Jackson denied having made the alleged inculpatory statements, thus, for all practical purposes, precluding defendant's right of cross-examination. This conclusion was reached in People v. Scott, 100 Ill App2d 473, 241 NE2d 579, where it was said at page 479:

The fact that Walker took the stand and that Scott had an opportunity to cross-examine him did not mitigate the error. Walker denied making the incriminating statement; confrontation was therefore meaningless and cross-examination would have been futile.

The United States Supreme Court, in Douglas v. Alabama, 380 US 415, discussed this precise point in a case where an accomplice, found guilty in a separate proceeding, testified at defendant's trial and invoked the privilege against self-incrimination when questioned about his alleged confession. The prosecutor was permitted to read statements

from the alleged document of confession that inculpated defendant. The court held this to be prejudicial, saying at pages 419 and 420, that the "[accomplice] could not be cross-examined on a statement imputed to but not admitted by him" and "hence, effective confrontation of [the accomplice] was possible only if [the accomplice] affirmed the statement as his." Any effective confrontation of Jackson in the instant case was precluded by virtue of this same reasoning, and the admission of his alleged confession inculpating defendant was prejudicial error.

While Bruton involved a prosecution under federal rules, it was later held that its doctrine should be applied to State prosecutions, and retroactively. Roberts v. Russell, 392 US 293. Since then, the Illinois Supreme Court has been faced with this issue in several cases.

People v. Armstrong, 41 Ill2d 390, 243 NE2d 825, held, relying upon Bruton, that defendant's conviction should be reversed and the cause remanded, since his constitutional right of cross-examination had been denied. In spite of cautionary instructions, the inculpating confessions of two codefendants which were admitted into evidence were found to have been prejudicial to the defendant.

Two recent cases treating with a different factual situation resulted in affirmance when the court decided that application of the Bruton rationale was not appropriate. The distinction between those cases and the one now before us is that there the defendant himself in each case had made admissions which were substantially similar to the codefendant's alleged accusatory admission. In People v. Rosochacki, 41 Ill2d 483, 244 NE2d 136, the court stated at page 494:

It is clear to us that a very substantial difference exists between a case in which a jury hears a codefendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and

the Bruton-type case in which the codefendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear.

Accord, People v. Rhodes, 41 Ill2d 494, 244 NE2d 145.

In our opinion, however, the instant case is the type in which substantial prejudice did result to the defendant as a consequence of the introduction into evidence of the inculpatory confession or admission attributed to a codefendant. Defendant Hammond made no similar admission, consistently denying participation in the crime, and the codefendants, in their testimony at trial, denied making the alleged admissions themselves and did not accuse Hammond. At this point in our consideration we believe, therefore, that the questioned testimony of Officer O'Brien was sufficiently prejudicial to require reversal of defendant's conviction and remandment of the cause for a new trial.

In arguing against this conclusion, the State relies heavily upon People v. Somerville, 42 Ill2d 1, 245 NE2d 461. While the issue in Somerville concerned the competency of trial counsel (whereas we are concerned with admissibility of evidence) and, further, arose under a post-conviction petition (whereas this is a direct appeal from the trial court), there are other basic grounds on which Somerville may be distinguished. In that case an accomplice, who was not being tried with the defendants, testified about his own extrajudicial statement implicating all three defendants—two Somervilles and Langusch. (Unlike the instant case, there was no objection by defense counsel to the admissibility of Arnold's statement.) The court pointed out, therefore, that the defendants "were not subjected to the risk of extrajudicial inculpating statements of a codefendant, . . . as involved

in Bruton." Contrariwise, the instant facts did result in such a risk to defendant Hammond, thereby invoking the safeguards embodied in Bruton.

The Bruton court, in discussing the harmful effects of incriminating extrajudicial statements despite cautionary instructions, pointed to the "practical and human limitations of the jury system." It mentioned that there exist contexts in which the risk is great that the jury may not follow instructions, and continued at pages 135-6:

> Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others.* [Footnote omitted.] The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

There were no "powerfully incriminating extrajudicial statements" of a codefendant in Somerville as there are in the case before this court. As mentioned, the statement in Somerville was introduced through the testimony of an accomplice who had himself made the out-of-court statement and who at the trial persisted in his accusation of the defendants. Importantly, the court said that the extrajudicial statement added nothing to the testimony of the accomplice who also admitted that he hoped for leniency in return for his testimony. This is a far different situation from ours in which a police officer testifies to a codefendant's extrajudicial confession. Since an officer's testimony is not tainted with the suspicion at-

taching to that of an accomplice, it is certain to be much more damaging and prejudicial to a defendant.

Further, in Somerville, the accomplice was apparently an eyewitness, whereas Officer O'Brien's testimony was hearsay vis-a-vis Hammond. The reason for the general exception to the hearsay rule in this situation (the probability of the truth of a confession as against the one making it) would not apply to an inculpatory statement against a third person such as Hammond. The situation in Somerville concerning the accomplice was altogether different.

■ Having decided that the codefendants' statements should not have been admitted, we look next at defendant's contention that the State failed to prove its case beyond a reasonable doubt, because if that were so, then outright reversal would be required. People v. Brown, 99 Ill App2d 281, 241 NE2d 653. The State's evidence as to the occurrence itself rests solely on the testimony of Officer O'Brien, since the other officers, though apparently stationed in their car for the purpose of observing, testified that they did not see Hammond attack O'Brien. Officer Kodatt only saw Hammond approach him, whereas he saw two other persons approach O'Brien and swing at him. Even though Officer Peebles was sitting in the same car with Kodatt (and apparently for the same purpose), he testified that the entire incident was out of his view. Without more, O'Brien's testimony is indeed weak, and hardly meets the quantum of proof necessary for a criminal conviction. The actual sequence of events immediately before and during the alleged robbery attempt is not altogether plausible as related by O'Brien. The knife which he allegedly found at the scene was preserved as evidentiary information in a most unorthodox way and contrary to accepted police standards. The presence of O'Brien's initials on the knife raises an additional question in this regard. Furthermore, we consider it important that, as outlined above, no essential part of O'Brien's

testimony was corroborated by his partners who were obviously assisting him on a joint assignment of some sort.

The only other testimony is that of the three defendants. Hammond denied any complicity in the attempted robbery, and neither Nelson nor Jackson implicated him at the trial. Absent the alleged confession of Jackson, the State's evidence is so unsatisfactory as to leave in the court's mind a reasonable doubt as to the guilt of the defendant, and it therefore becomes our duty to reverse the judgment of the Circuit Court. People v. Anderson, 30 Ill2d 413, 197 NE2d 24. The rule of Harrington v. California, 393 US 949, does not control this situation.

In view of the conclusion reached, the other points raised by defendant need not be considered.

Reversed.

DRUCKER, P. J. and McNAMARA, J., concur.