People of the State of Illinois, Plaintiff-Appellee, v. Andrew Harper and John Holmes, Jr., Defendants-Appellants.

Gen. Nos. 51,490, 51,491.

First District, Fourth Division.

July 31, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Theodore A. Gottfried and James J. Doherty, Assistant Public Defenders, of counsel), for appellants.

No brief for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

## OFFENSE CHARGED

Murder of one Atallah Sadallah. Ill Rev Stats 1963, c 38, § 9–1.

## JUDGMENT

After a jury trial, both defendants were convicted as charged and a verdict of death was returned. However, pursuant to Ill Rev Stats 1965, c 38, § 1–7(c)(1), the court sentenced both defendants to terms of 100 to 150 years.

## DEFENDANTS' CONTENTIONS ON APPEAL

1. The court erred in denying defendants' motion to suppress their confessions.

2. Defendants were not proven guilty beyond a reasonable doubt.

3. The court erred in denying defendants' motion for severance.

4. The court erred in denying defendants' motion to sequester the jury.

5. Defendants were denied due process of law by the method of jury selection employed by the court.

## EVIDENCE AT THE HEARING ON DEFENDANTS' MOTION TO SUPPRESS THEIR CONFESSIONS

Officer William Lenz testified for the State that on January 10, 1963, he was at Area 4, Homicide, with several other detectives and officers. He noticed three officers talking to the two defendants about 3:15 p. m.

All were seated at a table in the squad room, and neither of the defendants was handcuffed. The witness talked briefly to them at 4:00 p. m. with Officers Walker and Anderson present. Defendants were then placed in separate rooms adjoining the squad room.

He stated that he read some reports, and at 6:00 p. m. again talked with both defendants. He talked first to Holmes and questioned him for approximately 25 minutes concerning the killings of Jake Allen and Atallah Sadallah (the victim in this case). Holmes was handcuffed at this time. Then he talked to Harper, who was not handcuffed, about the same incidents. Both defendants related certain facts about the killing of Sadallah.

At 8:00 p. m., the witness had a brief visit with Holmes, asked him what he wanted to eat, and then sent for it. He next saw Holmes at 8:30 p. m., when Mr. Getty, the Assistant State's Attorney, arrived at the station. At 9:00 p. m., both defendants were involved in a lineup. He was also present at approximately 11:30 when Holmes gave a statement to Mr. Getty, which was recorded by a court reporter. This same routine occurred in a different room with defendant Harper at approximately 1:00 a. m. on January 11. He was with defendants from the time the confessions were concluded until the squadrol came.

He stated that defendant Holmes' physical appearance remained the same from the time he first saw him until he last saw him, which was sometime after 1:00 a. m. He did see Holmes spitting up blood around 8:30 p. m., and asked about his condition. Holmes told him that he had a nervous stomach, so they obtained a quart of milk for him.

Witness never struck either defendant. He was in the squad room during most of the day and had occasion to observe who entered and left the room where defendants were being held. He testified that no one threatened

424

defendants or beat or struck them. No one promised them leniency to induce a confession.

Detective Robert Walker testified for the State that he and Detectives Mason and Invergo arrested defendants on January 10, 1963, at approximately 2:45 p. m. at a welfare station on West Madison. Each man had a loaded gun and Holmes said they were riding in a stolen car. Defendants were brought to Maxwell Street police station where questioning began concerning five or six different robberies in Area 4. There was no conversation about the Sadallah matter. At 4:15 p. m., defendants were turned over to the homicide section, including Detectives Lenz and Anderson, for further questioning. After this, he saw defendants in handcuffs at various times.

He did not advise either man of a right to remain silent nor did he permit either man to make a phone call. Neither he nor anyone else struck defendants or made any threats or promises to obtain confessions, and defendants made no complaints about the way they were being treated. He did see defendant Holmes spitting up blood during an interrogation. Holmes told him that there was nothing he could do to help, as he had been drinking quite a bit and had ulcers and a bad stomach.

Richard J. Mason and Michael Invergo, police officers, testified for the State that they assisted in the arrest of defendants. Their testimony was substantially similar to that of Detective Walker. Invergo, however, had left the station at 5:00 p. m. and did not see Holmes spit up any blood.

L. Michael Getty testified for the State that he was an Assistant State's Attorney on January 10, 1963, and had occasion on that day, at 8:30 p. m., to see defendants at the Maxwell Street station. He met first with defendant Holmes, advised him of his right to remain silent, and asked him if he wished to make a statement. Holmes

said that he did. In response to a question, Holmes also stated that he had been treated well by the police. Holmes related certain facts about the death of Jake Allen. Getty then met Harper, and advised him of his right to remain silent. Harper also indicated that he had been treated well and made no complaint to the witness. He talked to Harper for 15 minutes concerning the Allen incident.

After the showup, he again talked with Holmes, who related facts about Sadallah's death. He advised Holmes of his rights, and suggested that they restrict the conversation to Jake Allen. After a visit with Harper, where a similar discussion took place, Getty returned to Holmes' room, and the court reporter then came in and took a written statement. The same process was repeated in defendant Harper's room culminating in a written statement.

Getty then returned to defendant Holmes and, using the same procedure involving two separate interrogations, obtained a written confession with respect to Sadallah's death. Harper, in like manner, also gave a statement. The witness stated that the initial oral statements of both defendants were substantially the same as those that were later recorded by the reporter.

The following morning, at the State's Attorney's office at 2600 South California Avenue, he read to defendants, and they read in his presence, the statements that had been recorded the previous night. They made corrections, initialed each page, and signed their names on the last page of each statement.

Defendants did not complain to him of any mistreatment. He did not see Holmes spitting up blood, nor did he see either defendant in handcuffs at any time. He did notice defendants drinking from cups and believed that he saw them eating some food during the course of the evening. When defendants signed the statements, they said they had slept but "not very well."

James Anderson, a police officer, was on duty at Area 4 on January 10, 1963. He observed and questioned defendants during their detention. He never struck them nor promised them leniency. Defendants never complained in his presence about their treatment. He did see them in handcuffs, and he saw defendant Holmes spitting blood. He questioned him about it, but Holmes merely replied that he had a bad stomach. Defendants were given something to eat that evening.

Paul Esling, a shorthand reporter for the State's Attorney's office, took two separate statements from each defendant concerning the deaths of Allen and Sadallah, respectively. Defendants never complained to him of bad treatment, nor did he see Holmes spit up blood. Neither he nor anyone else struck either defendant or made any threats or promises. He did not hear the Assistant State's Attorney caution defendants that they did not have to "make any statement against their constitutional rights."

Defendant Harper testified that he and Holmes were handcuffed at the time of their arrest at the welfare station. They were taken to Area 4, made to unload their pockets, and placed in separate rooms. Harper was handcuffed to a radiator. Police officers periodically came into the room to ask him questions about some robberies. Harper testified that he was not told of a right to remain silent, nor was he permitted to place a telephone call.

He testified that he was beaten by policemen many times during his detention at Area 4, and identified several. Sometimes he was struck from behind and didn't see who was responsible. He also heard Holmes crying in the other room and when they were brought together he noticed that Holmes was bleeding from the mouth. Holmes told him that he was hit in the stomach with a flashlight.

Harper testified that he did not tell Mr. Getty the truth because one of the policemen who had inflicted the punishment was present and he was afraid he would have

to undergo more of the same treatment. The statement that he gave was not given voluntarily, although it was the only time at the station when he was not handcuffed. He was not allowed to sleep, and ate at midnight only after making the confession. He stated that he made the confession up, that it was a falsification, a lie. The police had given him stacks of papers containing complaints from Area 4 with facts and information which he used in making up his statement. He was in "a regular formal lineup with eight or nine men." He signed the confession on January 11, but was not brought into court until January 31, 21 days after his arrest.

Defendant Holmes testified similarly as to the facts concerning the arrest. He stated that he was then transported to the police station, placed in a small room, and handcuffed to a radiator. He was beaten by several detectives while in that room, and identified them in court. The only one who didn't strike him was Officer Invergo. Detective Walker caused him the most pain by hitting him in the stomach with a flashlight. Several of the officers intermittently questioned him about some robberies. He told them he didn't know anything about those robberies and, consequently, "that's what kept me getting beat by these officers."

He stated that he didn't know anything about Atallah Sadallah. However, he did talk to Mr. Getty about Sadallah's killing following the second showup at the station. When he gave the statement, his condition was poor, as he was tired, sleepy, hungry and spitting blood. Mr. Getty later gave him a statement to be signed, although he never cautioned the witness as to his right not to give a statement or of any constitutional rights. After signing the statement, he received something to eat and was then taken to a lockup at 11th Street. He testified that the statements were false.

The following morning he was brought to the State's Attorney's office. He could read; he read the statement,

understood it, and signed it. After this, he was moved to County Jail. He found out at the jail that he had received a mild rupture as a result of being hit by the flashlight. He did not complain about police brutality when he got to the jail, nor had he mentioned it to Mr. Getty or any of the police officers at the station.

EVIDENCE AT THE TRIAL

Mohammed Zubi, for the State:

He was a bacteriologist and a partner of Atallah Sadallah in the operation of a store at 2711 West Ogden. At about 7:00 p. m. on December 28, 1962, he was standing at the meat counter and talking to Sadallah who was between the meat counter and the cash register. Two men, one shorter than the other, came in. They stood beside each other in front of the meat counter, whispering. Sadallah, standing about 4 feet from the two men, asked the witness to wait on them. They asked for 15 cents worth of bologna, so he started cutting the meat for them. Then the man identified by the witness as defendant Holmes pointed a long revolver with a yellowish tip. It looked like he was going to shoot, but he came closer and asked the witness to lie down. Holmes then called Jimmy Johnson, a helper in the store, and made him lie down also. When they were told to lie down, the other man, identified as defendant Harper, moved from the front of the meat counter toward the cash register. The witness then heard Sadallah say, "Don't shoot me, don't shoot me, don't kill me." He heard a shot; then all was quiet. Holmes came back to the meat counter and asked if they had any guns or money. The witness replied, "No, no gun, no money." He then heard the cash register drawers being opened, heard "money noise," and the cup being taken out. Everything then became quiet.

The witness then watched Holmes as he left. The store was equipped with side mirrors that enabled him to observe anyone in the store. He found his partner lying on

the ground, bleeding from his nose. One hundred dollars was missing from the cash register and money was also taken from Sadallah's pockets; probably $300 in all. The whole robbery took about three to five minutes, "could be more or less."

Jimmy Johnson and David Taylor were in the store at the time. He and Jimmy Johnson attended a lineup at Area 4 where they were shown pictures. He was shown many pictures, including one of defendant Harper, but didn't pick it first thing. Jimmy picked it and he then identified it. He then attended a lineup on January 10, 1963, where he identified both defendants.

James Johnson, for the State:

He is 16 years old and worked for Mr. Zubi at the time of the occurrence. He identified both defendants in court as the men who robbed the store. He was standing by the meat counter when defendants came into the store. As they announced the "stick up," he walked toward the back door, but defendant Holmes called him back and made him lie down. His testimony as to other events connected with the robbery is substantially similar to that of Mohammed Zubi. He identified both defendants at a lineup on January 10, 1963.

David Taylor, for the State:

He is now 15 years old and was 12 at the time of the occurrence. He walked into the store on December 28, 1962, and saw a man holding a gun, while another man was giving him money out of the cash register. Sadallah grabbed one of the men by the head as the man leaned over. The witness then ran into the basement. He identified defendant Harper as being in the store on that day. He saw only one side of his face for a very short time.

Richard Mason, for the State:

He is a police officer and, on January 10, 1963, assisted in the arrest of both defendants. At the lineup that evening, he saw Mr. Zubi walk up to both defendants and place his finger on them. He believes there were seven

men in the lineup. He saw James Johnson make the same identification.

L. Michael Getty, for the State:

He is an Assistant State's Attorney and, on January 10, 1963, obtained confessions from both defendants. He testified at trial after refreshing his recollection by reading a memorandum which he had written on January 11. After being advised of his constitutional rights, Holmes told him that he and Harper had gone to the store and that Harper had gotten into a scuffle with the storekeeper; that he (Holmes) then pulled a gun and cautioned two civilians not to move; that he then heard a click, a misfire, and a shot; that he and Harper then left with the money.

The witness testified further that Harper (after being advised of his constitutional rights) told him that he and Holmes had gone into a store and taken some money. Upon further questioning, Harper stated that the owner or cashier of the store had grabbed him and tried to pull his coat over his head; that he (Harper) then pulled a gun, which misfired; that the man fell to the floor and Harper pulled another gun and fired at the floor, thinking the man was reaching for something; that he and Holmes then took the money and ran out.

The witness then took written statements from both defendants after again advising them of their rights. Officer Lenz was present, as was Mr. Esling, the court reporter, who took down the statements and transcribed them for defendants' signatures. (Both written confessions—each admitted only as to its maker—were introduced into evidence at the close of the State's case.)

William Lenz, for the State:

He is a police officer and was present at Area 4 on January 10, 1963. He participated in several conversations with defendants on that day. He told Holmes, during one of the conversations, that Harper had informed them of his part in the shooting. Holmes asked that

Harper be brought in and that he say this in front of him. This was done. Then Holmes confirmed the shooting, relating in some detail the sequence of events.

Harper's statement came some time after the lineup. He also detailed the incident. Harper did not mention anything about being out of town on December 28, 1962.

In addition to the trial testimony recited above, witnesses Richard Mason, Robert Walker, Paul Esling, Michael Getty and William Lenz repeated substantially the same testimony which they had given at the hearing on defendants' motion to suppress.

Cecil Haynes, for the defense:

He has lived in Blytheville, Arkansas for about 44 years and is in the Yellow Cab business. On December 28, 1962, he was sleeping on a couch at the cabstand when he was awakened by two men, a woman, and a little child. They wanted a ride to the hospital because the child needed attention, and one of the men (identified by the witness as defendant Harper) asked for a cab. The witness paid one of his drivers to take them to the Chickasawba Hospital. The driver brought them back about 20 or 30 minutes later. The witness was lying down and didn't get a good look at the three persons, only their height. The first time he had observed them "for around five minutes." At that same time, another man was near the cabstand and asked him for help in starting a car. The witness refused, and one of the other two men told the man to leave. He then had an opportunity to see the two men for a third time, but "it was night," he didn't have his glasses on, and he "couldn't see too good."

He testified that the only way he could make an identification was by something that had been said that night. Defense counsel had taken him to see defendants prior to the trial, witness asked them questions, and Harper told him exactly what had been said by the man who wanted help with his car. He knew that the date all this occurred was December 28, "because it was the third day

432

after Christmas and [he] was back over there working day and night." The third day after Christmas could be as early as one minute after midnight on December 28. He had no written memorandum of the event and didn't remember which day of the week it was.

A year or two prior to the trial, some "fellers" came to Blytheville to discuss the event. They talked to the witness concerning the time of the occurrence and got an affidavit from him. He told them it had been "around the 28th of the month."

James Anderson, for the defense:

He is a police officer attached to Area 4. On December 28, 1962, and on January 10, 1963, he had conversations with Mohammed Zubi, and made out the police report on the death of Atallah Sadallah.

This witness was also called by the State in rebuttal, at which time his testimony was substantially similar to that he had given at the hearing on the motion to suppress.

Thomas Talty, for the defense:

He is a police officer who, on December 29, 1962, assigned Officer Hanna to take Mohammed Zubi to the album room to view photographs. As the supervising sergeant, he read and signed Hanna's report.

Steve Hanna, for the defense:

He is a police officer and took Zubi and Johnson to the album room. Both tentatively identified a photograph of Harper, but they stated that in the photo his lips appeared a little heavier and thicker than when they viewed him and that he appeared to have a growth on his chin which the offender did not have. They also picked out the picture of another suspect with similar features, but said that they didn't think he was the offender.

Andrew Harper, in his own behalf:

He testified that he left Chicago on December 21, 1962, with defendant Holmes, Lillian Bolan, and her daughter. They traveled to South Bend, Indianapolis and St. Louis,

arriving at 6:00 a. m. on the 23rd. They took a bus to Blytheville, Arkansas, where he was born and where his aunt lives. She did not have accommodations for them, so she gave the witness an address of another aunt in Carruthersville, Missouri, 28 miles away. They stayed in Carruthersville one night, stole a '53 or '54 Buick, and went back to Blytheville on the morning of December 28.

(It was stipulated that if John Allen, a policeman assigned to the auto pound, were called as a witness, he would testify that a 1953 Buick was reported stolen in Carruthersville, Missouri on December 28, 1962, at 2:15 a. m. and found in Chicago on January 4, 1963, in an alley at 1325 S. Bell Street.* Parts of the car and miscellaneous items were missing.)

They stayed in Blytheville that day, and that evening, at 11:00 p. m., Mrs. Bolan's baby had apparently stopped breathing or was sick. At the Blytheville Hospital they were told there was no doctor. A man stopped his car and offered to help. He woke up a man in a nearby cabstand and asked him if he could take these people to a hospital, which he did. (He identified the man at the cabstand as Mr. Haynes who had been in court the day before.) They were at the Chickasawba Hospital for 30 to 45 minutes before returning to the cabstand. There, he heard a man arguing with the cabman and Harper told him to leave. Then he (Harper), Holmes, the woman and her daughter headed back to Chicago, arriving at 2:30 p. m. on December 29. They left the automobile in the 2200 block of 13th Street.

He testified concerning his arrest and the treatment he claimed to have suffered at the hands of the police in Area 4. He stated that no one ever identified either defendant in the first lineup at 6:00 p. m. At the second lineup, Officer Anderson pushed James Johnson into pointing him out. The remainder of his testimony per-

---

* Five or six blocks from the scene of the murder.

taining to his arrest and detention was substantially similar to that given at the hearing on the motion to suppress.

Edward A. Gron, for the defense:

He is a record officer in the Cook County Jail. John Holmes' record indicates that he was committed to the jail on January 11, 1963. The record also shows that he was examined by a doctor upon admission; that his "General Physical Condition" was "Good"; that nothing was indicated as to "Any Emergency Condition"; that he had no recent scars, abrasions, bruises, marks or lacerations; and that thereafter he was not seen by a doctor until May, 1965.

Ulette Goodloe, for the defense:

She is a registered nurse at Cook County Jail Hospital and had seen John Holmes many times. He first came to the hospital on January 14, 1963, and had been there a total of 131 times by October 29, 1965. He never complained about ulcers.

On cross-examination, she testified that Holmes had never complained about injuries resulting from blows, and that when he first came in on January 14, 1963, it was for a gonorrheal discharge. After the original examination, medical records are kept separate from the jail record.

Louis Denson, State rebuttal witness:

He is a police detective and on January 10, 1963, was assigned to a homicide investigation at Area 4. (He did not testify on the motion to suppress.) He saw defendants there for about an hour and a half, during which time neither he nor anyone else struck, kicked or abused either defendant in any manner.

OPINION

Defendants initially contend that the court erred in denying their motion to suppress the confessions. They rely primarily on People v. Harper, 36 Ill2d 398, 223 NE 2d 841, in which these same defendants were tried for

the murder of one Jake Allen. The confessions in that case had been given a few hours before those in the instant case. There, the court listed reasons for remanding the cause for a new hearing on the motion to suppress. The reasons, which also form the base for defendants' objections in the instant case, were given as: (1) "the long delay in presentment to a judicial officer"; (2) failure of the State to call all of the witnesses to the confessions; and (3) lack of medical explanation for Holmes' bleeding. Harper, supra, at page 403.

██ In addition, defendants, in the case at bar, allege that they were not advised of their right to have a lawyer present at the time of their confessions, citing Escobedo v. Illinois, 378 US 478, and Miranda v. Arizona, 384 US 436. The court in Harper, supra, at page 403, held that the above-cited Supreme Court cases were not controlling since the trial had antedated them, and the same is true in the case at bar with respect to Miranda. While this is not true of the instant case with respect to Escobedo, that decision is inapplicable for the reason that these defendants did not request an attorney and were advised of their right to remain silent. Escobedo, supra, at pages 486–7. The court in Harper also stated at page 403:

> From the record it is clear that defendants were not denied their constitutional rights to counsel under the rules expressed in People v. Hartgraves, 31 Ill2d 375, cert den 380 US 961, 14 L Ed2d 152, and their confessions need not be set aside on the ground of failure to advise them of their right to counsel.

██ ██ Defendants assert that the voluntariness of their confessions was affected by the 20-day delay in taking them before a judicial officer, which contravened the statute requiring that this be done "without unnecessary delay." Ill Rev Stats 1965, c 38, par 109–1. The court in Harper stated that this should be considered on

the question of voluntariness, but held that such delay did not, per se, render the confession inadmissible. See the discussion in Harper, supra, at pages 402–403. We believe that such delay should be accorded very little weight where, as in the instant case, it did not precede the confession. The confessions in the case at bar were made orally soon after arrest and were recorded in due course, all written statements being completed within 10 hours of arrest. It has been held that "illegal detention after a confession has been voluntarily given, will not relate back so as to render the confession inadmissible." People v. Palmer, 31 Ill2d 58, 68, 198 NE2d 839; see also People v. Musil, 37 Ill2d 373, 378, 227 NE2d 751. We, therefore, find that the voluntariness of the confessions in the instant case was not affected by the subsequent delay in taking defendants before a judge.

Defendants argue that the State failed in its duty, at the hearing on the motion to suppress, to produce all material witnesses connected with the taking of the confessions, citing Harper, supra; People v. Wright, 24 Ill2d 88, 180 NE2d 689; and People v. Dale, 20 Ill2d 532, 171 NE2d 1. Specifically, they contend that an Officer Denson and a parole officer Bright were never called after the State had advised the court that they would be.

The State responds that defendants cannot now object to the State's failure to call these witnesses, because the applicable rule, as codified in Ill Rev Stats 1965, c 38, § 114–11(d), states:

> Objection to the failure of the State to call all material witnesses on the issue of the voluntariness of the confession must be made in the trial court.

There are no "peculiar circumstances" (see Harper, supra, at page 402) in the instant case that would permit circumvention of the statute. No objection having been made at the trial level, we will not entertain any at this point. In addition, we find fault with defendants' factual

437

presentation of this last issue. The record indicates that defendants advised the court that they wanted to present Officer Denson and the parole officer as their witnesses. Pursuant to this request, Officer Denson was in court the next day during a continuation of the hearing on the motion to suppress and was, therefore, available as a witness but was not called by defendants. He did testify on behalf of the State at the trial to facts bearing on the issue of voluntariness when he stated that he neither witnessed nor took part in any acts of brutality. These facts are proper for our consideration and strengthen our finding that the trial court properly denied the motion. People v. Hudson, 38 Ill2d 616, 619, 233 NE2d 403. Holmes' parole officer was not mentioned again by defendants after their first brief reference. Officer Lenz testified that he did not recall seeing any parole officer during the course of defendants' interrogation. The State is not required to produce everyone who may have seen the accused during his detention. People v. Nicholls, 42 Ill2d 91, 102, 245 NE2d 771; People v. De Simone, 27 Ill2d 406, 410, 189 NE2d 329. The basis for requiring witnesses to be called is the materiality of their testimony on the issue of the voluntary nature of the confession. People v. Sims, 21 Ill2d 425, 432, 173 NE2d 494. Because the parole officer was never again mentioned, it is reasonable to assume that he was not a material witness.

 Defendants claim that the court also erred in denying the motion to suppress because no report of Holmes' physical examination at the jail was produced, nor did the examining physician testify. We note again that defendants made no objections to the State's failure to provide this evidence. Moreover, testimony at the trial established that the jail records showed that, at the time he was admitted to the jail, defendant Holmes' general physical condition was "good," with no emergency condition and with no recent scars, abrasions, bruises, marks or lacerations. A nurse from the jail hospital also testi-

fied at trial that Holmes' first visit to the hospital was on January 14, 1963 (three days after his admission to the jail), when he complained of gonorrheal discharge. He did not complain to her of any facial injuries or injuries resulting from blows. Both defendants testified that they were beaten and that their confessions had been coerced. This was denied by each police officer who was present. Some officers testified, in partial corroboration of defendants' testimony, that Holmes was seen expectorating blood, but to each inquiry as to his condition, Holmes replied that it was caused by an ulcer or "bad stomach." Under these circumstances, we conclude that the trial court's finding that the confessions were voluntary was not contrary to the manifest weight of the evidence. People v. Nicholls, 42 Ill2d 91, 101, 245 NE2d 771.

■ Defendants next contend that they were not proven guilty beyond a reasonable doubt. We have already established the propriety of the admission of defendants' confessions both oral and written. Two State witnesses, Zubi and Johnson, observed defendants during the robbery for several minutes from just a few feet away, and later identified Harper from photographs. They also identified both defendants at a police station lineup. Another witness, David Taylor, identified Harper as the man who had struggled with the deceased. The testimony of the witnesses concerning the lineup identifications was certain and positive, and based upon an opportunity to observe defendants for a sufficient period of time and under adequate conditions of lighting and proximity. See discussion in People v. Cook, 113 Ill App2d 231, 252 NE2d 29.

■ Defendants place great stress on their alibi evidence to raise doubt as to their guilt. This evidence was inadequately corroborated by the testimony of Cecil Haynes. His testimony was quite weak, as he could not remember with certainty the date on which he claimed to have seen Harper in Arkansas, except to say that it

was "three days after Christmas," or "around the 28th of the month," around midnight. It was not clear from his testimony whether he was recalling the early hours of the 28th or of the 29th. This testimony, Harper's own alibi testimony, and the stipulation concerning the stolen car, all present, at best, a question of credibility of the witnesses which is a matter for the jury to determine. We conclude that there is adequate basis in the record to establish defendants' guilt beyond a reasonable doubt. See People v. Nicholls, 42 Ill2d 91, 95, 245 NE2d 771; and People v. Cook, supra.

 Defendants contend that the court erred by denying defendant Holmes' motion for severance, since the extrajudicial confessions of both defendants, subsequently introduced into evidence, prejudiced defendants and deprived them of a fair trial. Defendants lay great stress upon the doctrine of Bruton v. United States, 391 US 123, 137, but such reliance is misplaced. Bruton involved a situation in which an extrajudicial statement of a codefendant, incriminating both defendants, was admitted in a joint trial over the objection of the defendant who had not confessed. This was held to violate the latter defendant's sixth-amendment right to confront witnesses against him. The instant case, however, contains a significant factual distinction. Here, each defendant had himself made a confession which was substantially similar to that of his codefendant. See People v. Hammond, 115 Ill App2d 347, 253 NE2d 29. This exact situation has been treated by the Illinois Supreme Court in People v. Rosochacki, 41 Ill2d 483, 244 NE2d 136 where it was stated at page 494:

> It is clear to us that a very substantial difference exists between a case in which a jury hears a codefendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and the Bruton-type case in which the co-

defendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear.

Accord, People v. Rhodes, 41 Ill2d 494, 244 NE2d 145. We accordingly reject defendants' contention as to prejudice arising from the introduction of the confessions into evidence, and we therefore find no error in denial of severance.

 Defendants also assert a related argument that it was prejudicial to allow the jury to take the confessions to the jury room during their deliberations. The test of admissibility having been met, this was a matter within the discretion of the trial court. People v. Caldwell, 39 Ill2d 346, 356–359, 236 NE2d 706. We find no abuse of that discretion to the prejudice of defendants. People v. Allen, 17 Ill2d 55, 62–63, 160 NE2d 818.

Defendants next contend that the trial judge's denial of defendants' repeated motions to sequester the jury was a denial of an "absolute right," which constituted reversible error, citing a number of cases.

At the conclusion of each trial day, the judge carefully cautioned the jurors not to discuss the case with anyone under any circumstances, and admonished them not to listen to any news programs on television or radio, nor read any newspapers. Likewise, with the resumption of the trial each morning, the judge asked all the jurors whether they had heard anything about the case from any outside source. Each juror responded in the negative.

 The exception to this pattern occurred on the fourth day when it was brought to the court's attention in camera that publicity was being generated concerning police brutality in an unrelated matter. The court therefore granted defendants' motion to sequester for that night, but the publicity did not materialize. The following

441

day the court denied a motion for continued sequestration, stating that the paramount reason for sequestering the jury had been obviated because during the trial defendants had mentioned in evidence their earlier convictions and death sentences.

Well along in the trial, the trial judge stated, in denying a defense motion for sequestration:

> Well, I have admonished the jurors not to read any papers or listen to any radio news or any television newscasts. And I have observed myself that there has been no news items concerning this matter in any of the papers, nor have I heard or seen any radio or television newscasts. And I checked with the jurors each morning as they come in. And I will continue to do that.

Also, in closing argument to the jury, defense counsel said:

> All through this trial you have heard His Honor Judge Cohen tell you, "Don't read the newspapers, don't listen to the radio or watch television." It's almost silly to have told you that, insofar as nothing of this case has appeared in the news media.

 We do not believe that any prejudice to defendants resulted because the jury was not kept together during the trial. See People v. Wilson, 400 Ill 461, 477, 81 NE 2d 211; and People v. Fisher, 340 Ill 216, 243, 172 NE 743. In any event, this entire point is unavailable to defendants in this court because it was not presented to the trial court in defendants' written Motion for New Trial (which specified some 28 other grounds) and was therefore waived. People v. Irwin, 32 Ill2d 441, 443–445, 207 NE2d 76; People v. Nelson, 41 Ill2d 364, 365–366, 243 NE 2d 225; People v. Hunter, 23 Ill2d 177, 178, 177 NE2d 138; and People v. Flynn, 8 Ill2d 116, 118–119, 133 NE2d 257.

■■■ Defendant's final contention is that they were denied their right to an impartial jury, in violation of the sixth and fourteenth amendments to the United States constitution. They object specifically to the systematic exclusion of jurors at the voir dire, when veniremen were excused for cause if they stated that they had religious or conscientious scruples against the imposition of the death penalty. Defendants rely upon Witherspoon v. Illinois, 391 US 510, claiming that this method of selection resulted in a prosecution-prone jury that did not represent a cross-section of the community. This point is without merit. As the court stated with regard to the identical issue in People v. Cesarz, 44 Ill2d 180, 255 NE2d 1, at page 182:

> The same claim was made in Witherspoon and the United States Supreme Court noted that the data in that case was too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. In footnote 21 to the Witherspoon decision the court said, "Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case." *(Emphasis in original.)*

The trial judge in the instant case did not impose the death sentence recommended in the jury's verdict, thereby eliminating the Witherspoon objection. Furthermore, the data in this case are, as stated in Witherspoon at page 517, "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt," so we likewise cannot conclude that a jury thus selected is an unfair jury on the issue of guilt. Therefore, the method of exclusion utilized in the instant case does not require reversal of the judgment of conviction. See People v.

443

Cesarz, supra; and People v. Lee, 44 Ill2d 161, 254 NE2d 469.

The judgment is affirmed.

Affirmed.

DRUCKER and LEIGHTON, JJ., concur.