THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL GLANTON *et al.,* Defendants-Appellants.

(Nos. 56466, 56468, & 56469 cons.;

First District (2nd Division)—October 21, 1975.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant Michael Glanton.

Charles Locker, of Chicago, for appellant Larry Washington.

Paul Bradley and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant Leon Johnson.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Michael Glanton, Larry Washington, and Leon Johnson were tried together in a single bench trial for the murders by shooting of Clifford Reynolds and John Wilson on the night of 15 April 1969. (Ill. Rev. Stat. 1967, ch. 38, par. 9—1.) Each defendant was represented by his own separate attorney and pursued separate, though partially overlapping, defenses. All three defendants were convicted. Glanton and Johnson were sentenced to imprisonment for not less than 40 years nor more than 100 years; Washington was sentenced to imprisonment for not less than 50 years nor more than 100 years. From these convictions each defendant took his own separate appeal, which became ready for oral argument at different times and was separately briefed and orally argued by separate appellate counsel. On this court's own motion, the three separate appeals have been consolidated for opinion.

In his appeal, each defendant has assigned as reversible error the denial of his pretrial motion to suppress certain physical evidence, namely, three guns which the State proposed to introduce into evidence as the murder weapons: a .32-caliber revolver, a pump-action shotgun, and a bolt-action shotgun. The grounds for the motion of each defendant were the same: the said physical evidence had been seized: (1) in an illegal warrantless search of a garage to which the police had been led on two occasions: first by one John Edward Payton for the seizure of the revolver, and then by defendant Johnson for the seizure of the two shotguns hidden under floor-boards inside the garage; and (2) that Johnson had led the police to the shotguns as the proximate result of his own illegal warrantless arrest, so that the shotguns were "fruit of the poisonous tree." Wong Sun v. United States (1963), 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407.

At the hearing on the motion, Washington testified that he was arrested without a warrant and that the garage was under his control. Glanton testified that he was arrested without a warrant while doing nothing illegal at the time. Johnson testified that he was arrested without a warrant while doing nothing illegal at the time; that John Edward Payton, who was with the arresting officers and who had directed Johnson to put the shotguns in the garage, directed him to take the police to the guns, whereupon Investigating Officer William Nolan had said that, if Johnson did not do so, he (Nolan) was going to drive at a high rate of speed on the Congress Expressway and throw Johnson out of the speeding car; and that he had then taken the police to the garage and showed them where the shotguns were. For the State, Officer Nolan was the only witness. He testified merely that he had arrested Washington without a warrant, and had been present at the arrests of Glanton and Johnson; that Johnson had then taken him to a garage in which he had found the two shotguns. The court denied the motions of the defendants on the grounds that none of the defendants had established any property interest in the garage (the allegation by Washington of control of the garage was an unsupported conclusion); none had established the absence of probable cause for his arrest so as to demonstrate that the arrest was illegal; Johnson had not testified that Nolan's alleged threat of physical harm had causally coerced him into taking the officers to the garage.

Portions of the trial testimony of Officer Nolan and his partner, Officer Frank Bertucci, and of Chicago Police Youth Officer Ronald Gleeson bear on the arrests of defendants and on the search of the garage and serve to complete the obviously inadequate testimony of Officer Nolan (as to the existence of probable cause for the arrests) at the hearing on the motion to suppress the guns as physical evidence. For convenience, we summarize here those portions of their trial testimony. Bertucci testified that, on the morning of 16 April 1969, he was assigned with his partner, Officer Nolan, to investigate two homicides which had occurred the previous night. He and Nolan went immediately to the scene which was an alley alongside the railroad tracks in the vicinity of South Hamlin and South Avers Avenue in Chicago.[1] There he saw the two victims lying

---

[1] Since the geography of the area is frequently involved in the testimony, it will be helpful to describe the area as follows: Cermak Road runs east-west at 2200 South. It intersects South Hamlin Avenue (which runs north-south at 3800 West), South Avers Avenue (3834 West), and South Springfield Avenue (3900 West). The eastern end of the alley referred to by Officer Bertucci is at about 2247 South Hamlin Avenue. From there, the alley runs west by slightly south to South Avers Avenue and continues south to Springfield Avenue. Parallel to, and just south of, the alley are railroad tracks which run along the top of an embankment.

dead alongside the railroad tracks. In routine questioning of persons in the area, one Perry Roe told him about a group of neighborhood youths, called the Cermak Deuces, whose leader was John Edward Payton. Further questioning led him to visit defendant Washington, a member of the group, at the latter's place of work about 10:30 a.m. He told Washington that the police had information that he had been involved in a fight between two groups of youths the day before, and he (Bertucci) wanted to question Washington about the matter. Washington agreed to accompany him to the police station which constituted the headquarters of Area 4 Homicide, and did so. Before Bertucci questioned Washington at the police station, he talked to John Edward Payton and one Allen Holmes. Pursuant to these conversations, Bertucci, acting without a warrant, informed Washington that he was under arrest for murder; he also informed Washington of his constitutional rights, but did not question Washington at that time. Washington said nothing except to deny any involvement in the homicides.[2] The apparent reason for delaying the interrogation of Washington was that, as Officer Nolan testified, John Edward Payton had told Nolan that one of the three murder weapons could be found on the roof of a garage. Acting on that information, Bertucci and Nolan went with Payton to the garage which the latter pointed out (located at about 2217 South Avers Avenue) and recovered the revolver on the roof. On their return, they were driving along West Cermak Road at about 2 p.m. when they saw a youth officers' car from Area 4 with Chicago Police Youth Officers Gleeson and Sullivan standing talking to Glanton and Johnson. As Youth Officer Gleeson testified, the two youth officers had just then temporarily detained Glanton and Johnson because they were then in the company of a suspected truant. Bertucci and Nolan pulled up, and Bertucci arrested Glanton and Johnson without a warrant. Bertucci testified that he informed Glanton and Johnson that the charge was murder and then informed them of their constitutional rights. Thereupon Johnson asked if he could speak to their "chief," John Edward Payton. When Payton was brought over, he said to Johnson: "I tricked you, man, told them where the guns are." Officer

---

[2] On cross-examination, Bertucci testified that he had also talked to one Allen Robinson, who told him that, earlier on the evening of 15 April 1969, he (Robinson) had seen John Edward Payton with a .32-caliber revolver and had also seen Washington with a shotgun in his belt. On further cross-examination, Bertucci testified that he had also talked to one Clarence Payton (a brother of John Edward Payton), who had told him that, on the evening of 15 April 1969, all three defendants, together with the two victims, had rung his doorbell looking for John Edward Payton. It is not clear from the record precisely when Bertucci spoke with Robinson and Clarence Payton, but the conversations seem to have occurred before Washington was placed under arrest.

Nolan's version of this conversation was that Payton told Johnson that he (Payton) had "flipped" on everybody, and that Johnson should tell the police everything, including where the guns were, because the police knew most of it already. An objection by Glanton to the admissibility against him of the conversation between Payton and Johnson was sustained. Youth Officer Gleeson testified that he then took Glanton to Area 4 Homicide. Officer Bertucci testified that Johnson then directed Nolan and himself to the same garage which they had previously visited with John Edward Payton and in which Johnson concededly had no property interest; that, without a search warrant, all three entered the garage and Johnson pointed out the two shotguns hidden under floor-boards, and the officer seized the shotguns. Johnson said that he had had the bolt-action shotgun and Glanton had had the pump-action shotgun; the statement as to Glanton was stricken. The officers then returned with Johnson to the police station, where Bertucci readvised Johnson of his constitutional rights and then proceeded to question Johnson.

The foregoing is a complete summary of all the testimony relating to the arrest of each defendant and to the seizure of the three guns. As noted above, this summary includes not only all the testimony given at the hearing on the pretrial motion to suppress the guns, but also the relevant trial testimony of the police officers involved. We shall consider the contention of each defendant that the denial of the motions to suppress constituted reversible error after we have concluded our recital of the facts, which we now resume.

Each defendant was alleged to have made an oral inculpatory statement to the investigating officers. Each moved to suppress his statement. These motions to suppress the oral statements were heard in conjunction with the trial, and each motion was ultimately denied. The statements of Johnson and Washington contained references to one or both of their codefendants. But, at the trial, when the statement of each was admitted into evidence against him through the testimony of one or more of the police officers to whom the statement had been made, the trial judge meticulously excluded from the statement all such reference to either of the other two codefendants by sustaining objections thereto on hearsay grounds. In summarizing the statements, however, we will report them as testified to before the objections were made and sustained because one contention on this appeal relates to this matter.

We will now summarize the evidence at the trial exclusive of the testimony as to the arrests of each defendant and the seizure of the guns, which we have already summarized.

After "life and death" witnesses had testified as to each of the two victims, the State called Officer Frank Bertucci as its first principal wit-

ness. Bertucci's testimony to the point where he had begun to interrogate Johnson has already been summarized. He then testified as to Johnson's oral statement, made to him and to Officers Nolan and Denson after Johnson had again been advised of his constitutional rights. As already noted, objections to all references in the statement to the other codefendants were sustained. According to Bertucci, Johnson said that on the night in question he, Glanton, and Washington had taken both victims to the vicinity of the railroad tracks. Washington and the victim Reynolds had a conversation, in which John Edward Payton and Allen Holmes intervened. Finally, Washington pushed Holmes aside and shot Reynolds in the head with the revolver. At that point Johnson turned his head away from the victims and fired the bolt-action shotgun. He then heard Glanton fire the pump-action shotgun, and heard three or four revolver shots. He then fled the scene, and threw his shotgun alongside the garage in which it had been found. Bertucci concluded his testimony as to Johnson's statement by saying that Johnson had refused to make a written statement.

Bertucci then testified as to the oral statement made to him by Washington in the presence of Officers Nolan, Denson, and Mooney. Again, as already noted, objections to all references in the statement to the other codefendants were sustained. Bertucci said that, at about 3:30 p.m. when he had completed his interrogation of Johnson, he began to interrogate Washington by confronting him with the oral statements of John Edward Payton, Allen Holmes, and Johnson. Thereupon, Washington said that he, Glanton, and Johnson had taken the two victims to the alley. Holmes and John Edward Payton were about a half-block away and Washington called them. Payton talked to Washington about not shooting Reynolds. But at that time, Reynolds reached under his sweater as if going for a gun and Washington shot him with the .32-caliber revolver. Wilson then bent down as if to pick up a brick, and Washington shot him twice.

Later that day, according to Bertucci, Washington was readvised as to his constitutional rights, after which he added the following circumstances to his statement. He said that, prior to the shooting there had been an altercation between the victims, who were members of a rival group known as the Cermak Disciples, and himself and members of his group. After the altercation, he had gone to the garage with Glanton and one Melvin Pugh and had gotten the two shotguns and the .32-caliber revolver. He had given the bolt-action shotgun to Pugh. The three then met Holmes and Johnson, and Pugh gave the bolt-action shotgun to Johnson. Pugh and Holmes then left the group, after which

Washington, Glanton, and Johnson located Reynolds and Wilson and the shootings followed. Washington repeated his earlier account of the shootings but added that Johnson and Glanton had also fired their shotguns. Bertucci concluded his direct testimony by saying that Washington had refused to make a written statement and by saying that he had not talked to Glanton and had not observed any force or intimidation used as to any of the defendants. On cross-examination, Bertucci testified that he had not used physical force or any coercion or mental intimidation in obtaining the oral statements of Johnson and Washington.

The next witness for the State was Bertucci's partner, Officer Nolan, who had been with Bertucci throughout the investigation. His testimony as to the course of the investigation during 16 April 1969 and as to the arrests of defendants and the seizure of the three guns has already been summarized. He confirmed Bertucci's testimony that Johnson had been apprised of his constitutional rights before making his oral statement. Nolan's account of Johnson's statement confirmed Bertucci's account except that Nolan's account did not include the statement in Bertucci's account that Johnson had heard Glanton fire his shotgun. He confirmed Bertucci's account of Washington's oral statement and added two details to it: (1) Washington had admitted that, before Reynolds had reached into his sweater, he (Washington) had said: "We are going to kill him anyway." (2) Washington had said that after he had first shot Reynolds in the head, he had then fired two more shots into Reynold's head.

Nolan's testimony also related to Glanton. Nolan stated that either Youth Officer Gleeson or Youth Officer Sullivan or both had been present at Glanton's arrest; that Glanton had made no statement at the time of his arrest; and that Glanton had been taken to Area 4 Homicide. On cross-examination, it was brought out that Nolan had testified at the coroner's inquest, where he had said that Glanton, while in the squad car at the scene of his arrest, had stated to him (Nolan) that he (Glanton) was present at the time and place of the shootings; furthermore, at the coroner's inquest, Nolan had not testified that *Miranda* warnings had been given to Glanton. On redirect examination of Nolan, it was brought out that, at the preliminary hearing which was subsequent to the coroner's inquest, Nolan had testified that he was not present when Glanton had made any statement at the scene of his arrest. However, Nolan added, Glanton's father had come to Area 4 Homicide after Glanton had been brought there. In Nolan's presence, Glanton's father had asked Glanton whether he had killed Reynolds and Wilson, and Glanton had nodded yes. On re-cross-examination, it was brought out

that the police report, which Nolan dictated and in part typed, contained no reference to the above exchange between Glanton and his father.

James Schreier, an Assistant State's Attorney, then testified for the State that he had advised each of the three defendants of his constitutional rights and had ascertained that each understood them. He then asked each whether he wished to make a statement to him (Schreier), but none did.

The next witness for the State was Melvin Pugh, who was aged 14 at the time of the trial. He testified that, at about 6 p.m. on 15 April 1969, he saw the three defendants with John Edward Payton, one Wilmer Tanner, and one Larry Morris at West Cermak Road and South Avers Avenue. The group went to a poolroom at the intersection of Ogden Avenue and South Avers Avenue [which was the next intersection north of Cermak Road on Avers]. At about 9 p.m., Pugh (who was then a member of the Cermak Deuces) was with the group as they went to Cermak Road and South Springfield Avenue, where the group encountered the victims, Reynolds and Wilson. Pugh saw this encounter and also saw John Edward Payton pick up a garbage can as if to throw it. Later that night, Pugh, still with part of the group, saw Washington, Glanton, and John Edward Payton in an alley near West Cermak Road and South Avers Avenue; Payton had a pump-action shotgun. Payton told Johnson to get a gun. Still later, Pugh saw the three defendants leave Cermak Road and South Avers Avenue and walk west through the alley toward South Springfield Avenue; at that time Glanton was carrying a pump-action shotgun and Johnson was carrying a bolt-action shotgun. Payton then told Pugh to go home, which Pugh did; his home was at 2252 South Avers Avenue. He was sitting on the porch of his home with Wilmer Tanner when he next saw five persons walking through a field in the vicinity of Cermak Road and South Avers Avenue; one of the five was Glanton and one was the victim Wilson. After the group had been out of sight for about six minutes, Pugh heard what sounded to him like three shotgun blasts and five revolver shots, sounds with which he was familiar. Pugh then went into his house; the time was about 10:20 or 10:30 p.m.

On cross-examination, Pugh admitted that he had signed a prior written statement dated 24 March 1970 and given voluntarily and in the presence of an older friend of his to the Assistant Public Defender representing Washington. In the statement he said that he had seen the two victims at about 7 p.m. on 15 April 1969 and had not seen them thereafter; that he had never seen the three defendants on that night either in the presence of the victims or with guns; and that he had not

heard any shots on that night. In this statement to the Assistant Public Defender, Pugh also said that he had earlier given a written statement to the police in the presence of his mother, signed by him and by his mother. He said that the police had taken him from his school to a police station and had told him that, unless he admitted in a written statement to be signed by him and his mother that he had seen the defendants with guns and with the victims on the night of 15 April 1969, the police would arrest him for murder. He testified that he knew that it was wrong of him and of his mother to sign such a statement for the police, but that he had done so in order to avoid arrest.

On further cross-examination, defense counsel sought to demonstrate Pugh's poor ability to observe by asking him to identify Wilmer Tanner, who was in court; Pugh was unable to do so until Tanner stood up in court and was pointed out.

On redirect-examination, Pugh confirmed that he had read and then signed the written statement given to the Assistant Public Defender under date of 24 March 1970. He also confirmed that he had given a prior written statement to the police under date of 17 April 1969. As to the latter statement, he explained that on the morning of 16 April 1969, the police had picked him up at school and brought him to a police station where his mother was waiting for him. He arrived at the station about noon and gave the statement in the presence of his mother about twenty minutes later. He conceded that the events related in the statement to the police were much fresher in his mind than the events related in his later statement to the Assistant Public Defender. On re-cross examination, he said that, when he gave the statement to the police, both he and his mother had been afraid that he would be charged with murder and that he had given the statement because of that fear; he had not been afraid of the Assistant Public Defender when he gave the statement to him.

The next witness for the State was Chicago Police Youth Officer Ronald Gleeson. He testified that he had initially detained Glanton and Johnson while they were walking along a street in the company of a suspected truant. Shortly thereafter, Officers Bertucci and Nolan arrived on the scene and they arrested Glanton and Johnson. Gleeson then drove Glanton in a squad car to Area 4 Homicide and advised him of his constitutional rights on the way. Gleeson said that Glanton had asked who "fingered" him. At the police station, Gleeson had accompanied Glanton to a washroom where Glanton had admitted that he was present at the shooting. A little later at the station, Glanton had told Gleeson that he Glanton had had a shotgun and had pointed it at Reynolds, turned his head, and fired. Glanton's father had then entered the room with Officer

Nolan. Glanton's father asked Glanton "if he did it." Glanton nodded his head and said yes. His father said: "If you had to kill someone, why did you kill one of your own brothers?" Gleeson himself did not make a written report of these statements of Glanton and of Glanton's father, nor had they been incorporated into the single police report dictated by Nolan.

Through the testimony of Burt Neilson (whom the State qualified as a ballistics expert) and of evidence technicians Gunnell and Koludrovic, the State next established the chain of possession of bullets, bullet pieces, and lead pellets which had been removed from the bodies of the victims. Neilson then testified that the bullets had been fired by the .32-caliber revolver which had been found on the roof of the garage, and that shotgun shell casings found at the scene of the homicides had been ejected from the shotguns found in the garage.

The parties then stipulated that, if Dr. Jerome Kearns were called, he would be qualified as an expert pathologist and would testify that the death of Reynolds was caused by three bullet wounds to the brain and that the death of Wilson was caused by two bullet wounds to the head.

The parties stipulated as a fact to the age of each defendant, and also stipulated that the coroner's protocol had found that three lead pellets and 16 BB shots were taken from the body of Reynolds and that two lead pellets were taken from the body of Wilson.

The State then rested its case-in-chief.

Each defendant testified in his own defense, and Glanton's father also testified in Glanton's defense.

Johnson testified that, at the time of his arrest on 16 April 1969 in the company of Glanton and of one Charles English, he had not been notified of any of his constitutional rights; that, after the three of them had been put in a squad car, Officer Bertucci had threatened to use physical force against him if he did not tell Bertucci what he wanted to know; that John Edward Payton had told him not to direct the police to the shotguns, but that he did so anyway, as he had nothing to hide; that Bertucci had struck him on the way back to the police station; that he had not made any statement at the police station; that he had not been advised of his constitutional rights until he met Assistant State's Attorney Schreier. On cross-examination, it was brought out that the members of Johnson's group kept their guns not only at the garage but also at the home of John Edward Payton, and that Officer Nolan had misidentified Johnson as Washington and Washington as Johnson during the trial.

Glanton testified that, at 5 p.m. on 15 April 1969, he was playing

basketball at a park. From there, he went to a poolroom where Washington, John Edward Payton, Clarence Payton, Allen Holmes, and Melvin Pugh were present. At 10 p.m., he went home by himself; Johnson and Washington were then still at the poolroom. From 7 a.m. until 1 p.m. on 16 April 1969, he looked for a job. In the afternoon, he was detained by Youth Officers Gleeson and Sullivan while he was walking along the street with Johnson and English; the latter was a juvenile and apparently a truant. Officers Bertucci and Nolan then arrived and arrested him for the murder of Reynolds and of Wilson; he had immediately denied any knowledge of the shootings. Later, at the police station, his father asked him if he had had anything to do with the shootings, and he said no. His father then told him to say nothing and that he would get him a lawyer. In fact, he had never shot anyone, had not been present at any shootings on 15 April 1969, and had not given guns to anyone on that date.

Glanton's father, one Malcolm X, then testified that he had seen his son at the police station on 16 April 1969. At that time, he had simply told his son to say nothing and that he would get him a lawyer. He denied having told his son that, if he had killed anyone, it ought not to have been one of his own brothers; he had merely commented to his son that it looked as though only black people got killed. He had been present when Assistant State's Attorney Schreier had advised his son of his constitutional rights.

Washington testified that, at the trial, both Bertucci and Nolan had misidentified Johnson as Washington and Washington as Johnson. No police officer had ever advised him of his constitutional rights; only Assistant State's Attorney Schreier had so advised him. He had not made any statement as to the shootings. What had happened was that Officer Nolan had beaten him and a black officer had threatened to shoot him. Despite his request to telephone either his mother or one of his two brothers, he had not been allowed to do so. When Bertucci had finally come to interrogate him, he spoke with Bertucci only because of his fear that Nolan would continue to beat him. Bertucci began the conversation by saying that John Edward Payton, Allen Holmes, Glanton, and Johnson had already implicated him in the homicides. Owing to his fear of Nolan, he had merely said to Bertucci that he would go along with whatever Bertucci said. In fact, he had not seen either of the victims. The revolver exhibited at the trial belonged to John Edward Payton. So did the shotguns found in the garage; he had been told that they had been placed there a week and a half before the date of the shootings. On the night before his arrest, he had not given Melvin Pugh a pump-action shotgun, nor had he taken such a gun from Pugh. On cross-examination,

Washington testified that, on the night of the shootings, he had been at the pool hall on Ogden Avenue from 6 p.m. to 10:30 p.m., and had gone directly home from there. The defense then rested. In rebuttal, Officer Nolan correctly identified Washington and Johnson and stated that he had previously made the same correct identification. Officer Denson testified that he had used no force or threats of force against any of the defendants. The State then rested.

The trial court thereupon denied the motion of each defendant to suppress his oral statement, found each defendant guilty as charged, and imposed sentence.

OPINION

We begin by considering the contention made by each defendant that his warrantless arrest was illegal because it was made without probable cause. The relevance of the contention is that it was one of two bases for the pretrial motions made by each defendant to suppress the three guns as evidence. That basis was that the guns were found and seized as the direct result of the allegedly illegal arrests, so that the guns were fruits of the poisonous tree. The hearing court denied all the motions to suppress the guns, which denial is itself also assigned by each defendant on these appeals as reversible error. We will deal later with the second basis for the contention that the denial of the motions to suppress constituted reversible error.

Since the issue of the arrest of each defendant without probable cause was first raised on their pretrial motions to suppress the guns, we must examine the testimony at the hearing on those motions. Defendants' theory as to this issue is based on *People v. Moncrief* (1971), 131 Ill. App.2d 770, 268 N.E.2d 717. In *Moncrief*, the defendant was charged with possession of marijuana found in two suitcases which he had checked with an airline as personal baggage when he had purchased his flight ticket at the airline's office in the airport. Airline employees became suspicious of the contents of the suitcases, opened them without the defendant's knowledge or consent, and found the marijuana. They then notified the sheriff's office; a deputy sheriff responded, observed the marijuana in the open suitcases, located the defendant in the airport, and arrested him without a warrant. The defendant filed a pretrial motion to suppress the marijuana as evidence on the ground that his warrantless arrest for the charged offense had been made without probable cause. At the hearing on the motion, the defendant testified in part that, at the time of his arrest, he was simply walking in the airport from the airline's ticket office to the passenger waiting area for his flight, and was doing nothing unusual and nothing which would indicate he was then violating

any law. In its opinion, this court held that, while the burden of proof of the illegality of the search (and therefore of the illegality of the warrantless arrest) was on the movant under the provisions of section 114—12 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1969, ch. 38, par. 114—12), his testimony had established a prima facie case, such that the burden of going forward with the evidence on the issue of probable cause for the arrest then shifted to the State. This court then held that the State had not sustained its burden, so that the motion to suppress should not have been denied. For the same proposition, see also *People v. Ezell* (1965), 61 Ill.App.2d 326, 210 N.E.2d 331 (abstract opinion).

In the instant case, at the hearing on the motions to suppress, the testimony of each defendant as to his arrest was as follows: Both Glanton and Johnson testified that at the time of their arrests, they were doing nothing unusual and nothing that would indicate that they were violating any law; they were simply standing on a street talking with two Youth Officers. While Washington did not expressly testify that he was doing nothing unusual or illegal at the time of his arrest, he testified that he had been arrested at his place of work without a warrant for questioning as to his conduct on the preceding day; the fair inference from that testimony is that, at the time of his arrest, he was not doing anything unusual or in violation of any law. Each defendant, therefore, by his testimony established a prima facie case for the lack of probable cause for his arrest, such that the burden of going forward with the evidence as to probable cause for the arrest shifted to the State.

The only witness for the State at the hearing was Officer Nolan. On the matter of the arrests, he simply testified that, on 16 April 1969, he had no warrant to arrest anyone, and that he had arrested Washington without a warrant. It is obvious that Nolan's testimony failed to sustain the State's burden of going forward with the evidence. Hence, based on that evidence the trial court should not have denied the motions to suppress, and we so hold.

The State, however, relies on *People v. Braden* (1966), 34 Ill.2d 516, 216 N.E.2d 808, as establishing the principle that, where evidence *at the trial*, given prior to the admission into evidence of the thing sought to be suppressed, demonstrates the existence of probable cause for the warrantless arrest, the error in denying the motion to suppress (pursuant to an erroneous finding that, at the hearing on the motion, the State had sufficiently demonstrated the existence of probable cause for the warrantless arrest) was not prejudicial to the defendant and did not constitute reversible error. We note here that *People v. Cassell* (1968), 101 Ill.App.2d 279, 284, 243 N.E.2d 363, 366, indicates that, where the State,

at the hearing on a motion to suppress certain physical evidence, failed to sustain its burden of going forward with the evidence on the issue of probable cause for a warrantless arrest, the fact that the State offered sufficient evidence of the existence of probable cause at the trial was no substitute for its failure to do so at the hearing on the motion. But it does not appear from that opinion that the State had argued the position previously established in *Braden*, nor that the State had brought the decision in *Braden* to the attention of this court.

Pursuant to the *Braden* doctrine, we examine the testimony given at the trial before the admission of the guns into evidence. In routine questioning of persons in the area of the homicides, Bertucci had learned from Percy Roe of the neighborhood group known as the Cermak Deuces, led by John Edward Payton. Bertucci testified that he had arrested Washington in the police station after talks with Payton and Allen Holmes, the substance of which talks was not related. He said that, at Washington's place of work, he had merely requested Washington to come with him to the police station for questioning, and Washington had agreed to do so; hence, there had been no need to arrest Washington at that time. Washington's name had come up specifically in Bertucci's talk with Robinson, and, in his talk with Clarence Payton, Washington was placed in the company of the victims on the night in question. While the precise time of Bertucci's talks with Robinson and Clarence Payton does not appear in the record, his activities from shortly after noontime to his arrest of Glanton and Johnson about 2 p.m. permit the inference that these talks must have occurred before noon and before Washington's arrest. As for the arrests of Glanton and Johnson, Bertucci by that time had talked with John Edward Payton, Allen Holmes, and Allen Robinson; Clarence Payton had put Glanton and Johnson in the company of the victims on the night in question. Bertucci also had the oral statement of Melvin Pugh, in which he placed Washington, Glanton, and Johnson with guns in the company of the victims on the night in question. Finally, at the time of the arrest of Glanton and Johnson, John Edward Payton had told Johnson that the police already knew most of what had happened.

■■ We conclude that the evidence at the trial clearly established the existence of probable cause to arrest each of the three defendants. Under the doctrine of *Braden*, the consequence is that the error in finding that the State, at the hearing on the motion to suppress, had sustained its burden of going forward with the evidence on the issue of probable cause to arrest (and the denial of the motions insofar as they were based on that issue) was not reversible error.

The second basis for the contention of each defendant that the denial

of his motion to suppress the guns was reversible error is that the warrantless searches of the garage were illegal because they were made without probable cause and without consent. We have just held that the warrantless arrest of each defendant by the police was legal because it was made with probable cause. But it is clear that these searches cannot be justified on the ground that they were made incident to the lawful arrest of any defendant. The second search for the shotguns was indeed made as a consequence of, but not incident to, the arrest of Johnson. While our holding that the arrests were legal means that the legality of the searches cannot be attacked as having been tainted by having been made pursuant to illegal arrests, neither may the legality of these searches be established as having been made incident to the legal arrests. Hence, the legality of the searches must be attacked or established without any relationship to the arrests.

■■ In attacking the legality of the searches, each defendant has a threshold problem of his standing to attack. The hearing court held that none had such standing, and we agree. At the hearing, none of the defendants claimed any property interest in any of the three guns. Neither Glanton nor Johnson claimed any property interest in the garage. Washington did claim that the garage was under his control, but this claim was a mere unsupported conclusion. At the trial there was an indication that the garage was under the control of Allen Robinson. In challenging the legality of a warrantless search, one must allege and prove an invasion of one's own personal privacy. No prejudice to one's own constitutional right to be protected against unreasonable search and seizure exists by reason of a search and seizure proximately invasive of the privacy of another, even when that search produces evidence against one. *Alderman v. United States* (1969), 394 U.S. 165, 22 L.Ed.2d 176, 89 S.Ct. 961; *People v. Black* (1972), 52 Ill.2d 544, 288 N.E.2d 376, *cert. denied,* 411 U.S. 967, 36 L.Ed.2d 689, 93 S.Ct. 2155, *rehearing denied,* 412 U.S. 963, 37 L.Ed.2d 1012, 93 S.Ct. 3015.

We add, moreover, that, even if Washington were deemed to have standing to challenge the legality of the searches, he could not successfully do so, because the trial testimony established probable cause for the warrantless searches. Prior to the first search which yielded the revolver, the investigating officers knew that a shooting crime had been committed; and John Edward Payton had told Officer Nolan that one of the murder weapons was to be found on the roof of the garage in question and had offered to lead the officers to the garage. Prior to the second search which yielded the shotguns, Officer Nolan testified that John Edward Payton, as Johnson's "chief," had told Johnson to tell the police everything, including where the guns were. While Johnson testified

that John Edward Payton had told him not to lead the police to the guns, he added that he had done so anyway because he had nothing to hide. When Johnson led Officers Bertucci and Nolan to the same garage where they had already found the revolver on the roof, they clearly had probable cause to make the second search.

■■ The third contention made by each defendant on his appeal is that the denial of his motion to suppress an inculpatory statement allegedly made by him was reversible error. All the motions were heard in conjunction with the trial. We now consider this contention of each defendant. Defendant Johnson first denies having made any statement. But Officers Bertucci and Nolan testified that he did and related the substance of the statement. Hence, the issue is one of credibility for the determination of the trial court. Johnson then contends that any statement he may have made was made without his having received *Miranda* warnings. But Officer Bertucci testified that he had advised Johnson of his constitutional rights at the time of Johnson's arrest. And both Officers Bertucci and Nolan testified that Johnson had been advised of his constitutional rights just prior to making his statement. Again, the issue is one of credibility for the trial court. Johnson next contends that any statement which he may have made was not made voluntarily but was coerced by police officers. Officer Bertucci specifically named Officers Nolan and Denson as having been present when Johnson made his statement. Each of those three officers testified that no force or threat of force or mental intimidation had been used against either Johnson or any defendant. Again, the issue is one of credibility for the trial court. As to each of the above three matters, there is ample testimony which, if believed, supports each finding, so that none of the findings can be deemed to be against the manifest weight of the testimony. (*People v. Higgins* (1972), 50 Ill.2d 221, 278 N.E.2d 68; *People v. Johnson* (1969), 112 Ill.App.2d 148, 251 N.E.2d 393.) Hence, we cannot disturb the credibility determination of the trial court.

■■ The only contention which Johnson seriously argues on his appeal is that the State failed to sustain the burden which has been placed upon it by *People v. Armstrong* (1972), 51 Ill.2d 471, 282 N.E.2d 712, whenever a defendant alleges that his statement was not made voluntarily. That burden is that the State must call "all material witnesses connected with the controverted confession" or explain why it has not done so. We note first that the requirement relates to *material* witnesses to the making of a statement, and does not extend to all police officers who may have had some contact with a defendant while he was in custody. The purpose of the requirement is to compel the State to produce those officers who were witnesses to, or who had a role in procuring, the making of the

controverted statement. We note next that Officer Bertucci testified that Johnson's statement was made to him in the presence of Officers Nolan and Denson; the State called these three officers. From the record it is clear that Bertucci and Nolan were the principal investigating officers for these homicides. It is true that Bertucci also testified that several other police officers were present during the interrogation of Johnson, and Johnson estimated that he had been questioned at one time or another after he had been taken into custody by at least ten police officers. Johnson's brief mentioned several officers who were not called but who are named at one point or other in the testimony. There is, however, no showing that these officers were material witnesses to Johnson's statement. For example, Youth Officer Sullivan was present at Johnson's arrest but does not appear to have had any other contact with Johnson. An Officer Hussion was at the garage when Johnson pointed out the shotguns, but there is no indication that he had any contact with Johnson at the police station. When Assistant State's Attorney Schreier saw Johnson and Johnson refused to make a written statement to him, an unnamed stenographer and a Detective Corbett were present, but neither had had anything to do with the oral statement which Johnson had then already given to the police. The single police report made by Nolan and Bertucci on the entire investigation mentioned five officers by name in addition to Bertucci, Nolan, and Denson. But none are expressly connected with Johnson at the police station; for example, Officers Learas and Looney are the officers who took the statement of Melvin Pugh. We conclude that defendant Johnson has not shown that material witnesses to his statement were not called by the State.

■■ Finally, as to this matter, the State points out that Johnson failed to raise this objection at the hearing during the trial and therefore waived it. (*People v. Harper* (1970), 127 Ill.App.2d 420, 262 N.E.2d 298, *cert. denied,* 404 U.S. 1062, 30 L.Ed.2d 751, 92 S.Ct. 743; *People v. White* (1974), 22 Ill.App.3d 180, 317 N.E.2d 323.) Johnson replies with the principle that his oral post-trial motion (to the oral character of which the State did not object) makes all errors appearing of record reviewable. (*People v. Irwin* (1965), 32 Ill.2d 441, 207 N.E.2d 76; *People v. Parker* (1970), 129 Ill.App.2d 43, 262 N.E.2d 751.) Owing, however, to the very nature of this particular objection and to the necessity that the State have timely opportunity to meet it, we think that the general principle relating to oral post-trial motions has no application to this specific objection.

We turn now to defendant Washington's contention, which is based on his allegation that his statement was not voluntarily made. The single factor upon which he relies to demonstrate the involuntary character of

his statement is that his prestatement requests that he be allowed to telephone a member of his family were ignored, and he was held incommunicado. The refusal of his requests violated an Illinois statute (Ill. Rev. Stat. 1967, ch. 38, par. 103—3), violated his right to due process of law, and was a coercive factor affecting the voluntariness of his statement. (*City of Chicago v. Harmon* (1969), 117 Ill.App.2d 361, 254 N.E. 2d 573.) Washington testified that his request was made and ignored, and the State did not deny it.

On a motion to suppress an oral statement as involuntary, the State has the burden of proving its voluntary character by a preponderance of the evidence. The trial court must determine whether the suspect in custody was advised of his constitutional rights and knowingly and voluntarily waived them. (*People v. Gonzales* (1974), 22 Ill.App.3d 83, 316 N.E.2d 800.) The issue of waiver depends on the total circumstances under which the statement is taken and no single factor is controlling. (*People v. Baker* (1973), 9 Ill.App.3d 654, 292 N.E.2d 760.) The finding of the trial court will not be disturbed unless it is contrary to the manifest weight of the testimony. *People v. Burbank* (1972), 53 Ill.2d 261, 266, 291 N.E.2d 161.

■■ Hence, the single fact that Washington's request to telephone a member of his family was ignored, is not per se dispositive of the issue of voluntariness. There was testimony that Washington was advised of his constitutional rights several times, and specifically just before he made both his original and his additional statement. Assistant State's Attorney Schreier testified that, when Washington refused to give a written statement to him, Washington indicated that he had already given an oral statement to the police. In addition, according to Schreier, Washington did not then appear to be in poor physical condition nor did he complain of having been physically abused. Officers Bertucci, Nolan, and Denson each testified that he had not used, or observed the use of, force or threats of force or mental intimidation against any of the defendants. On the totality of the testimony, we cannot say that the trial court's finding of voluntariness was against the manifest weight of the evidence.

Glanton's contention as to the inadmissibility of his inculpatory statements is based simply on his testimony that he did not make any statements to Youth Officer Gleeson either in the squad car or in the police station, together with his testimony, supported by the testimony of his father, denying that the alleged exchange between himself and his father had occurred. Officer Bertucci testified that he had not talked to Glanton. Youth Officer Gleeson testified that, in the squad car on the way to the

police station after Glanton's arrest, he had advised Glanton of his constitutional rights and Glanton has asked who "fingered" him. Gleeson then testified that, in a washroom in the police station, Glanton had admitted to him that he (Glanton) was present at the shootings; and, later in the station, Glanton had told him that he (Glanton) had had a shotgun and had pointed it at Reynolds, turned his head, and fired. Both Gleeson and Nolan testified to the later exchange between Glanton and his father. In impeachment of both officers, it was brought out that neither the exchange nor the prior statements to Gleeson had been included in the single police report made by Bertucci and Nolan covering the entire investigation of the homicides. In impeachment of Nolan, it was brought out that, at the coroner's inquest, Nolan had testified that, at the scene of his arrest, Glanton had stated to Nolan that he (Glanton) was present at the time and place of the shootings, whereas at the trial Nolan had just testified that Glanton made no statement at the time of his arrest. In rebuttal, the State brought out that, at the preliminary hearing held after the coroner's inquest, Nolan had testified that he was not present at any statement which Glanton may have made at the time of his arrest.

The foregoing is a summary of all the testimony as to Glanton's alleged statement. We think it created an issue of credibility for the determination of the trial court. Again, there was ample testimony which, if believed, supports the finding of the trial judge, so that the finding cannot be deemed to be against the manifest weight of the evidence. (*People v. Higgins; People v. Johnson.*) Hence, we cannot disturb that determination.

We turn now to contentions made by one or two of the defendants, but not by all three.

Defendant Johnson contends that he was entitled to a Fourth Term discharge under section 103—5(a),(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1967, ch. 38, par. 103—5(a),(d)). Johnson was taken into custody on 16 April 1969. Various continuances, either agreed to by both parties or requested by Johnson, ran to 25 August 1970, on which date the 120-day period began to run. On 16 December 1970 (the 113th day of the term), pursuant to section 103—5(c) of the Code (Ill. Rev. Stat. 1967, ch. 38, par. 103—5(c)), the State filed a written form motion for a 60-day extension of time based on the allegation that the State had, without success, exercised due diligence by making several attempts to locate two named witnesses (John Edward Payton and one Johnnie Wilson, the father of the victim John Wilson), whose testimony was material to its case; that they could not be located

at the present; but that there were reasonable grounds to believe that they might be located at a later date.[3] Johnson merely objected generally to the motion, whereupon the trial court granted it. The trial began on 10 February 1971, which was within the 60-day extension. Johnson now alleges that later developments at the trial demonstrated that neither witness' testimony was vital to the State's case. John Edward Payton did not testify at the trial. Johnnie Wilson merely testified as a "life and death" witness as to his victim-son; the implication is that the State could readily have procured someone else to give that formal, though essential, testimony, but no ready substitute is suggested. We note that the statutory subsection merely requires the State to allege that the then unobtainable testimony is material to its case, not that it is crucial. The materiality of the "life and death" testimony is clear, and enough has been said about John Edward Payton to make clear the materiality of the testimony which he might have given.

■■ Aware of the opinion of this court in *People v. Bey* (1973), 12 Ill.App.3d 256, 298 N.E.2d 184, to the effect that allegations of supporting facts in the State's motion must be denied and put at issue before the State need present any evidence in support of those allegations, Johnson now urges that his general objection to the motion must be deemed such a denial, so that the trial court erred at granting the motion in the absence of supporting evidence presented by the State. But in *Bey*, the defendant had also merely objected to the motion as a dilatory tactic, and we held that the general objection did not constitute a denial of the State's allegations of supporting facts so as to put those allegations at issue and require the presenting of evidence. We decline, therefore, to construe Johnson's general objection to the State's motion as a denial of the State's allegations of supporting facts. We add, moreover, that our review of the record discloses no demand by Johnson for a Fourth Term discharge at any time during the proceedings in the trial court. His contention is raised for the first time on his appeal. It is well settled, however, that any right to a Fourth Term discharge must be asserted prior to conviction or in a post-trial motion. *People v. Taylor* (1965), 32 Ill.2d 165, 204 N.E.2d 734; *People v. Browry* (1972), 8 Ill. App.3d 599, 290 N.E.2d 650.

The next contention, made by Glanton, is that the trial judge, being human, could not, despite his long experience in conducting criminal bench trials, fail to have been affected, prejudicially to Glanton, by hav-

---

[3] Johnson makes the point that the motion was unverified, but section 103—5(c) does not require a verified motion. *People v. Canada* (1967), 81 Ill.App.2d 220, 225 N.E.2d 639 (construing that paragraph's predecessor, Ill. Rev. Stat. 1959, ch. 38, par. 748.)

ing heard the damaging hearsay references to him and to his participation in the homicides contained in the oral statements of Johnson and of Washington as testified to by Officers Bertucci and Nolan. Glanton concedes that his continuing objections on hearsay grounds to the admissibility of those references against him were sustained, so that the prejudicial hearsay was not erroneously admitted into evidence against him. His point is that the trial judge, meticulous though he was in sustaining the hearsay objections after the police officer had testified to the damaging references in recounting the full statements of Johnson and of Washington, could not avoid being prejudiced thereby. Glanton does not, however, point to any indication of such prejudice in the record or to any indication in the record that the trial judge adverted to the excluded hearsay in convicting him.

Johnson makes the same contention in respect to the hearsay references to him in the full statement of Washington. He also makes the same concession as Glanton that the said hearsay references were not erroneously admitted into evidence against him, and, like Glanton, he has not pointed to any indication in the record either of inherent prejudice or of improper adversion to the excluded testimony.

Illinois courts have often stated the rule to be that, absent some indication to the contrary in the record, a trial judge in a bench trial is presumed to have considered only competent evidence. (*People v. Bey* (1972), 51 Ill.2d 262, 281 N.E.2d 638; *People v. Clarke* (1971), 50 Ill.2d 104, 277 N.E.2d 866; *People v. Fuca* (1969), 43 Ill.2d 182, 251 N.E.2d 239; *People v. Pelegri* (1968), 39 Ill.2d 568, 237 N.E.2d 453; *People v. Wallenberg* (1962), 24 Ill.2d 350, 181 N.E.2d 143.) The basis for this rule is the recognition that a trial judge possesses the ability to determine the factual issues based only upon legally relevant and competent evidence introduced at trial, and will not let any personal bias, prejudice or irrelevant material enter into his determination. (*People v. Smith* (1975), 29 Ill.App.3d 519, 331 N.E.2d 99.) Likewise, there can be no assumption of any inherent prejudicial effect on the trial judge merely from his having heard the excluded hearsay references. (*People v. Smith.*) As the Federal Third Circuit Court of Appeals said in *United States ex rel. Bennett v. Myers* (3rd Cir. 1967), 381 F.2d 814, 818: "There would be a complete breakdown in the operation of the machinery of justice if we refused to recognize the capacity of a trial judge to put aside what he has heard if it is not legally relevant to the case." We conclude there is no merit to these contentions of Glanton and of Johnson.

Glanton next contends that the State suborned perjury prejudicial to him in adducing the trial testimony of Melvin Pugh, and the trial testimony of Youth Officer Gleeson and Officer Nolan as to his oral state-

ments and the exchange between his father and himself. The basis for the contention as to Pugh is that his trial testimony was in accord with his written statement to the police under date of 17 April 1969, which he testified he had made solely because of police threats to charge him with the murders of the victims Reynolds and Wilson and which he had repudiated in his later written statement to the Assistant Public Defender. The basis for the contention that the described trial testimony of Gleeson and of Nolan was perjured is that the statements attributed to him by Gleeson and the exchange between him and his father were not included in the police report covering the entire police investigation of the homicides.

■■ In order to constitute perjury the testimony involved must be shown "by clear, convincing and satisfactory evidence to have been, not false merely, but to have been wilfully and purposely falsely given, and to have been material to the issue tried and not merely cumulative but probably to have controlled the result." (*People v. Lewis* (1961), 22 Ill.2d 68, 71, 174 N.E.2d 197.) In the instant case, Pugh gave a statement to the police implicating all three defendants. About eleven months later he gave a written statement to the Assistant Public Defender repudiating his statement to the police, and he explained that he had been coerced into making that statement by threats that, if he did not do so, he would be charged with the murders of Reynolds and Wilson. Still later he testified at trial in accord with his first statement to the police, thereby repudiating his statement to the Assistant Public Defender, which was then used to impeach his credibility at trial. But the mere repudiation of testimony given earlier (namely, the statement to the police) does not establish that the earlier testimony was perjured, especially when that repudiation is then itself repudiated by the giving of trial testimony in accord with the earlier testimony. *People v. De Mario* (1969), 112 Ill.App.2d 420, 251 N.E.2d 274, *cert. denied* (1970), 397 U.S. 1057, 25 L.Ed.2d 675,90 S.Ct. 1404; *Cobb v. United States* (6th Cir. 1947), 161 F.2d 814.

As to the testimony of the officers, the mere failure to have included the making of Glanton's inculpatory statements and the exchange between him and his father in the comprehensive police report covering the entire investigation does not establish that their trial testimony as to those circumstances was perjured, but at most affects the credibility of that testimony. We conclude that there is no merit to Glanton's contention that the State suborned perjury in presenting its case-in-chief.

Each defendant next contends that the evidence against him was legally insufficient to prove his guilt beyond a reasonable doubt. To re-

view this contention, we examine, as to each defendant, the evidence in the State's case-in-chief.

■■ (1) As to Glanton: The basic evidence against Glanton consists of the testimony of Gleeson as to Glanton's inculpatory statements made to him at the police station after he had advised Glanton of his constitutional rights on the way to the station; the testimony of Gleeson and of Nolan as to the exchange between Glanton and his father; the testimony of Pugh tying Glanton to the group of Cermak Deuces who encountered the victims (members of the Cermak Disciples) on the night in question, and then to the smaller armed group (Glanton carrying a pump-action shotgun) who were in the company of the victims later that evening in the immediate area of the shootings shortly before Pugh heard shotgun blasts and revolver shots; the technical testimony that the pump-action shotgun, found in the same garage with the bolt-action shotgun which had ejected shotgun shell casings found at the scene and with the revolver which had fired the fatal bullets, had ejected shotgun shell casings found at the scene, plus the statement in the Coroner's protocol that shotgun shell BB pellets had been taken from the body of Reynolds. The testimony of Gleeson, Nolan, and Pugh was impeached in varying degrees: the testimony of Gleeson and of Nolan to some extent; the testimony of Pugh to a greater extent. Glanton's testimony denying the making of any statements to Gleeson, and his testimony, supported by the testimony of his father, denying the exchange between himself and his father, is also noted. We conclude that there was evidence for the State which, if believed, was legally sufficient to prove Glanton guilty beyond a reasonable doubt. *People v. Clark* (1972), 52 Ill.2d 374, 288 N.E.2d 363.

(2) As to Johnson: The basic evidence against Johnson consists of the testimony of Officers Bertucci and Nolan that, pursuant to the direction of John Edward Payton (the chief of the group called the Cermak Deuces, of which Johnson was a member), Johnson led them to the garage and to the shotguns which had ejected the shell casings found at the scene of the shooting (confirmed by the testimony of Johnson that he had done so despite the direction of Payton that he not do so, because he had nothing to hide); the testimony of Officers Bertucci and Nolan as to the inculpatory statement of Johnson made to them in the presence of Officer Denson after *Miranda* warnings had been given and without the use of force or threats of force or mental intimidation; the testimony of Pugh tying Johnson to the group of Cermak Deuces who encountered the victims (members of the Cermak Disciples) on the night in question in the vicinity of West Cermak Road and South Springfield Avenue, and

then to the smaller armed group (Johnson carrying a bolt-action shotgun) who set off from South Avers Avenue toward South Springfield Avenue; and the technical testimony that the bolt-action shotgun, found in the same garage with the pump-action shotgun which had ejected shotgun shell casings found at the scene of the shooting and with the revolver which had fired the fatal bullets, had ejected shotgun shell casings found at the scene, plus the statement in the Coroner's protocol that shotgun shell BB pellets had been taken from the body of Reynolds. Only the testimony of Pugh was impeached, and Johnson testified simply that, despite physical beatings, he had made no inculpatory statements to the police. We conclude that there was evidence for the State which, if believed, was legally sufficient to prove Johnson guilty beyond a reasonable doubt. *People v. Clark.*

■■ (3) As to Washington: The basic evidence against Washington consists of the testimony of Officers Bertucci and Nolan as to the inculpatory statement of Washington (made to them at the police station after he had been advised of his constitutional rights and without the use of force or threats of force or mental intimidation), in which he admitted having fired the shots from the revolver found at the garage into each of the victims, but only in alleged self-defense; the testimony of Nolan, as to the alleged self-defense, that Washington in his statement had admitted that, before Reynolds had allegedly reached into his sweater as if going for a gun while Washington was talking to John Edward Payton, Washington had said: "We are going to kill him anyway," and that Washington had admitted that he had fired two revolver shots into Reynolds' head after he had first shot Reynolds; the testimony of Pugh tying Washington to the group of Cermak Deuces who encountered the victims (members of the Cermak Disciples) on the night in question in the vicinity of West Cermak Road and Springfield Avenue, and then to the smaller armed group (Washington with the revolver which had fired the fatal shots) which set off from South Avers Avenue toward South Springfield Avenue; the technical testimony that the revolver found on the roof of the garage had fired the shots which were fatal to both victims; the statement in the Coroner's protocol that bullets fired from a .32-caliber revolver had been taken from the body of each victim; and the testimony of the pathologist that death had been caused by those bullets to the brain. The testimony of Pugh was impeached as noted above, and Washington testified that, owing to beatings by Nolan, he had simply acquiesced in whatever Bertucci wanted him to say. We conclude that there was evidence for the State which, if believed, was legally sufficient to convict Washington beyond a reasonable doubt. *People v. Clark.*

■■ Finally, each defendant contends that his sentence is excessive, in view of his age and of his rehabilitation potential, and should be reduced. We do not agree. The evidence for the State demonstrates that these killings by members of a youth gang were deliberate, and that Washington was the principal executioner. In imposing the sentences after the hearings in aggravation and mitigation, the trial judge took into account the heinous character of the killings and the rehabilitation potential of the defendants.

For the foregoing reasons, the conviction and sentence of each defendant is affirmed.

In No. 56466, judgment affirmed.

In No. 56468, judgment affirmed.

In No. 56469, judgment affirmed.

DOWNING, P. J., and STAMOS, J., concur.