(No. 39290.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* ROBERT JACKSON, Appellant.

*Opinion filed November 22, 1968.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago, (SHELVIN SINGER and JAMES J. DOUGHERTY, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and THEODORE A. SHAPERO, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE SOLFISBURG delivered the opinion of the court:

Defendant Robert Jackson was convicted of murder along with DeSoto Allen in a joint trial in 1956, and on appeal by Jackson alone this court remanded the cause to the circuit court of Cook County on the issue of the "voluntariness" of the confession. (31 Ill.2d 408.) The circuit court, after a hearing on the issue, held that the confession was voluntary and that the conviction be permitted to stand. Defendant has appealed to this court, contending that the confession was involuntary, and that there were reversible errors in admitting a certain record of the county jail, and in admitting the testimony, from the original trial of this cause, of a police officer since deceased.

From the voluminous record relating to the confession, it appears that defendant, age 23, was first arrested on February 29, 1956, for the murder of Isaac Berger during the course of a robbery of Berger's store. He was released three days later by the court, on March 2. Defendant was re-arrested at 10:30 P.M. on March 15, 1956, in the home of his mother and in the presence of his sisters, Eloise Johnson and Mary Hodge, by Officers Charles, Herring and Trout, while Officers Engelsman and Coffey were stationed outside in the rear. Defendant was handcuffed and taken to the Fillmore Police Station, and, according to the testimony of Officers Herring, Engelsman and Trout, the Supervisor of the Homicide Bureau at Police Headquarters at 11th and State, defendant was questioned by them and by Officer Charles in the detectives' interrogation room on the first floor of the Fillmore Station.

At first defendant denied any participation in the crime; and after being questioned for approximately ten minutes, he was confronted with the prisoner DeSoto Allen, who had apparently implicated him, according to the police reports. Defendant then admitted his part in the crime, and implicated a Don Wilson, from whom he claimed he had rented the gun.

Defendant denied he made any admission of his own

participation, and said he was questioned only about a gun he had. He testified that he had been taken down to the basement of the police station, which he described, that a bag was put over his head, and that he was struck behind the ear and beaten in the stomach by several officers. He also said that he thought he asked Officer Herring to make a phone call—that was the only officer or person he asked —and the officer didn't say anything. About half an hour after defendant had arrived at the station, he and police officers went to Wilson's house on Kedzie Avenue, at defendant's direction. Wilson was not at home, but his wife told them he was at work. Defendant and Officers Herring and Charles waited at the Wilson home for about an hour; while some of the other officers went to get Wilson and proceeded with the investigation of the gun.

Apparently during this interval, at about 12:30 A.M., about two hours after defendant was arrested, according to the testimony of his two sisters, they went to the station and asked if Robert Jackson was there. They were told, "No." Then they left the station.

About 1:00 A.M. on March 16, Officers Herring and Charles returned to the station with defendant and Wilson. At approximately the same time, according to the testimony of the victim's stepson, the police telephoned and asked him to come down to the station because two persons had confessed to the murder of Isaac Berger. At about 1:30 or 1:45 A.M., while waiting in the station for Assistant State's Attorney Whalen to arrive, the stepson observed for some fifteen minutes the two persons sitting at the opposite end of the room, about 25 feet away. They were laughing and joking. He observed nothing unusual about their faces or any exposed portions of their bodies. They were later identified to him as defendant and DeSoto Allen. Defendant testified that while waiting for the Assistant State's Attorney to arrive, he had been beaten again.

At approximately 2:00 A.M. Assistant State's Attorney

Whalen and a stenotypist arrived to take a statement from defendant and DeSoto Allen. It was taken in the captain's office, and present in the room were defendant, Allen, Whalen, the stenotypist, police officers Charles, Halley and Herring, and the victim's stepson.

Whalen propounded the questions and defendant and DeSoto Allen answered. The statement took about twenty minutes, and was taken down by the stenotypist, who later testified that the typed statement corresponded to his steno-typed notes, and was in the same condition as it was in 1956 when he completed it, except for being more frayed and including trial exhibit markings.

Whalen testified that he had an independent recollection of the event, had observed defendant during the twenty minutes when he questioned him, and noticed nothing unusual about defendant's hands or face. Furthermore, no one in the presence of the Assistant State's Attorney abused defendant; nor did defendant complain to him of any such abuse. The court reporter who took the statement also testified that there was nothing unusual about defendant's appearance, as did the victim's stepson. DeSoto Allen said he saw blood on defendant's wrists and on his clothes, but mentioned it to no one at the time. He also stated that he saw no one strike or mistreat defendant at any time. Defendant said he answered the assistant State's Attorney's questions because they had beaten him, but he did not complain to the assistant State's Attorney because he was not asked about any complaints.

At the conclusion of the questioning Whalen asked defendant and Allen if they would be willing to sign the statement when it was typed up, and they said they would. However, when defendant was taken to Whalen's office later that morning, at about 10:30 A.M., defendant refused to sign the statement.

Defendant's mother testified that when she went to the station at about 10:00 or 11:00 A.M. on March 16, the

morning after the arrest, she was not allowed to see her son, and didn't know whether he was there or not. She also testified that when the police took her son to the police station, she called her own mother and they got in touch with lawyer Schultze.

At about 2:00 P.M. that same day, March 16, defendant was taken to the county jail, where he was processed. Defendant said he never mentioned any of his beatings to the doctor who examined him at the jail, but complained that his wrists were sore from the handcuffs.

The receiving clerk at the jail brought defendant's inmate record, and stated that he did not know for a fact the processing procedures in 1956, but that defendant's inmate card was the same as those which he presently handles in his work. That card recited certain personal history of defendant, the cause for his commitment, his picture, fingerprints, and the section filled out by the examining doctor. Mrs. Dicks, an employee of the jail since 1955, identified the card as an original record, taken from the old files of the county jail, and testified that such examinations were standard procedure and doctors were required to include such information, but she could not identify the particular doctor's signature. The medical notations indicated that defendant's condition was good, and showed on the printed figure of the human form some old scars on the elbows.

All of the police officers who had been with defendant at any time from his arrest until he was taken to the county jail the following afternoon, testified at this hearing, with the exception of Officers Charles and Halley, who, as stipulated, were dead. The testimony of Officer Charles was read at this hearing. Defendant was his prisoner and was with him continuously from his arrest until after his statement was taken by the assistant State's Attorney. Officer Charles described the arrest, the questioning in the detectives' room, the trip to the Wilson home and defendant's statement to the assistant State's Attorney, denying that anyone else in

his presence ever struck defendant, or placed a bag over defendant's head. "I was with him the whole time, so he was not beaten at all."

Officer Herring, who was a partner with Officer Charles on the case, testified that he was present when DeSoto Allen was brought in to confront defendant, and the latter admitted his part in the crime and told the officers where he got the gun. Officer Herring also testified that he went with defendant to the Wilson house, waited there an hour, returned with defendant to the station, and was present when Whalen questioned the defendant as well as later that morning when defendant was taken to Whalen's office. Officer Herring denied that he was ever in the basement of the Fillmore Station in all his life, or that he or anyone else took defendant down to the basement or struck defendant in his presence, or offered defendant any reward or immunity to make a confession.

Officer Engelsman, who also questioned defendant initially and accompanied him to the Wilson house, stated that at no time did he ever strike defendant, nor did anyone in his presence strike or harm defendant. Engelsman, however, left the Wilson house to pursue the investigation of the gun. When he returned to the station about 1:00 A.M., he saw defendant sitting on the bench waiting for the assistant State's Attorney, and denied seeing any blood on defendant's wrists or clothes.

Officers Coffey and Hodges made similar denials of ever striking defendant or seeing anyone else strike him.

Also testifying for the State was Officer Trout who, in 1956, was the supervisor in the Homicide Bureau at 11th and State in Chicago. He testified that he was called from his office, was present at the arrest and at the questioning of defendant, that Officer Herring was with him, and he recounted many of the details of the aforementioned sequence of events. He did not advise defendant that he could make a phone call, nor did he hear any other officer do so,

and he explained that since defendant was arrested at home, in the presence of his family, they knew his whereabouts. Officer Trout stated that defendant was out of his presence when he went to get Wilson, and also for about five or ten minutes at the station. He did not strike or beat defendant, nor did anyone else do so in his presence, nor did he or they make any promises or offer any reward or immunity for any testimony.

Officers Kelly and Boso testified for the defense that they had arrested defendant in late February for the murder of Isaac Berger, and the record shows that defendant was released by the court on March 2. Also testifying for the defense were defendant's mother and two sisters, as well as defendant, and DeSoto Allen, as previously noted in reviewing the sequence of events.

On the basis of substantially the foregoing evidence the trial court concluded that the confession was voluntary.

With respect to the propriety of that conclusion, we recognize that the State has the burden of proving the voluntariness of the confession by a preponderance of the evidence (*People* v. *Harper,* 36 Ill.2d 398, 402; *People* v. *Thomlison,* 400 Ill. 555, 561), and that the trial court need not be convinced beyond a reasonable doubt. *People* v. *Duncan,* 40 Ill.2d 105, 107.

It is evident here that defendant's confession was not affected by the rules promulgated in the *Escobedo* and *Miranda* cases (*Escobedo* v. *Illinois,* 378 U.S. 478, 12 L. ed.2d 977, 84 S. Ct. 1758; *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), requiring that defendant be advised of his right to counsel, since the trial here antedates both those decisions. *Johnson* v. *New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772.

Nor was there any infringement of the Illinois procedural rule applicable in 1956, requiring that the accused be permitted to notify his family within 24 hours of his arrest (Ill. Rev. Stat. 1955, chap. 38, par. 449.1), since de-

fendant was arrested at his mother's home in the presence of his entire family. The fact that his sisters were not able to see defendant when they visited the jail two hours after his arrest could be explained by the undisputed evidence that defendant left the station about a half hour after his arrival and accompanied and directed the officers to the Wilson house. It is also undisputed that defendant had been taken to the office of Assistant State's Attorney Whalen about 10 A.M. on March 16, which is approximately the time his mother asked to see him at the Fillmore Station. Consequently, these circumstances do not constitute any deliberate isolation from his family as prohibited by the purport of the rule of criminal procedure and condemned in the cases. *People* v. *Duncan,* 40 Ill.2d 105.

In determining the voluntary nature of a confession the court will consider such circumstances as the duration of defendant's confinement before the confession, his age and experience in criminal matters, any physical coercion or disregard of the rudimentary necessities of life or isolation from family or friends, or any promise of reward. (*People* v. *Duncan,* p. 108.) Moreover, where the voluntariness of a confession is raised, all material witnesses connected with the taking of the confession must be produced or their absence explained. *People* v. *Harper,* 36 Ill.2d 398, 401.

The record here includes the testimony of all the policemen who had in any way been with defendant from the time of his arrest until he was sent to the county jail. These officers present when defendant first admitted his participation in the crime testified that it occurred right after he was confronted by DeSoto Allen, his alleged accomplice, which was between ten and thirty minutes after he arrived at the Fillmore Station from his home. Although defendant denied he made such an admission at that time, his denial is inconsistent with the ensuing trip which he and the police took, at his direction, to the Wilson house to locate the

gun; and with the police notifying the victim's stepson to come down to the station because two men had confessed.

All of the officers who had questioned him when he first arrived at the station, or had been with him at Wilson's house, or when he returned to the station around 1:00 A.M., while waiting for Whalen, denied ever striking or seeing any one else strike defendant or take him down to the station basement. In fact, Officer Charles, who had been assigned to defendant, unequivocally testified at the first trial that he had been with defendant continuously, and that neither he nor anyone else had ever struck defendant. The deceased officer's partner, Officer Herring, made a similar detailed statement at this hearing.

The police testimony was, in effect, corroborated by other facts and circumstances. The victim's stepson testified that he observed two men, later identified as defendant and Allen, for some fifteen or twenty minutes while they were waiting for the assistant State's Attorney, and that they were laughing and joking. Such conduct is hardly the response of a man who had just been brutally beaten, as defendant professed to have been. Moreover, Whalen, the stenotypist, and the victim's kin all testified that they noted nothing unusual about defendant's appearance or the exposed portion of his person, and that would not have been the situation had defendant been beaten as he described. Those witnesses further corroborated the officers' testimony that no one ever struck defendant at any time during the question-and-answer session in the captain's office. Even defendant's witness DeSoto Allen stated that no one ever struck defendant in his presence.

Defendant's assertions of his beatings are further negated by the fact that he never mentioned them to anyone at any time—until the trial: not to the court at the hearing on March 2, nor to Whalen when defendant was questioned, nor when he went to Whalen's office later that morning and refused to sign the statement, nor even to the

jail doctor who examined him that very afternoon of March 16. Defendant admitted that he only told the doctor that the handcuffs caused his wrists to bleed, and the doctor's notations on the inmate card described defendant's condition as good and as having only some old scars on his elbows.

The fact that defendant described the basement after a fashion certainly does not establish that he was beaten there; in fact, there is no showing that such description of the premises was accurate. Officer Engelsman, who had been at that station for over ten years and had been down in the basement for old records, stated he had never seen the old table defendant mentioned.

Nor could defendant's confession be deemed coerced because "from past experience he knew the police would beat him." (*People* v. *Hanson*, 31 Ill.2d 31, 39.) The State's duty is limited to producing "all material witnesses connected with the taking of the statement, or explain their absence," and the State is not required to produce all witnesses in defendant's prior encounters with the police. That is particularly true here where defendant never mentioned to the court at the hearing on March 2 the alleged brutality of his first arrest on February 29 of which he complains presently.

Although numerical superiority of policemen testifying to the propriety of official conduct cannot be deemed determinative that a confession is voluntary, neither does the mere assertion that a confession was elicited by physical beatings establish *per se* that the confession is involuntary.

This court recognizes that the totality of circumstances must be examined in determining whether a confession is voluntary. In our view, the circumstances here attending defendant's arrest and prompt confession in no way establish that the confession was involuntary.

With respect to the cases cited by defendant in support of his contention that the confession was involuntary, we

find no analogy to *People* v. *Harper,* 36 Ill.2d 398, where defendants had been handcuffed to a chair and radiator, where the admitted internal bleeding of one defendant was without explanation, where one of the officers who was a material witness did not testify, and defendants were held in jail for 21 days before being brought before a judicial officer. Nor do we find *People* v. *Duncan,* 40 Ill.2d 105, determinative. There an 18-year-old, held on a disorderly conduct charge, was incarcerated for 18 days in solitary confinement, fed once a day, isolated from his family, and after release by the court, was interrogated extensively for hours while handcuffed to a chair until he confessed. In *People* v. *Thomlison,* 400 Ill. 555, there were unmistake-able physical signs of a beating on defendant's person which were seen and corroboated by his mother, the lawyer and the photographer. In *People* v. *Santucci,* 374 Ill. 395, not only were there physical beatings after defendant's two arrests, which were just three days apart, but there was medical evidence by a doctor respecting the bruises on the body of the 17-year-old defendant.

We find defendant Jackson's case more analogous to *People* v. *Ackerson,* 37 Ill.2d 117, 122, where, even though the accused claimed physical brutality and other coercion, his confession was deemed the result of "learning of his accomplice's confession, rather than as a result of illegal police coercion." In our view the determination of the trial court here that the confession was voluntary could in no way be deemed manifestly against the weight of the evidence. *People* v. *Spencer,* 27 Ill.2d 320, 325.

Defendant contends further that it was reversible error to admit in evidence his county jail inmate card on the ground that it was a medical record. In support thereof defendant cites *Wright* v. *Upson,* 303 Ill. 120, 144, where it was held that the nurses who made entries in hospital records are required to testify to their correctness before the records could be admitted; and also Supreme Court Rule

236 permiting the admission of business records but excluding "medical records." Ill. Rev. Stat. 1967, chap. 110A, par. 236.

As previously noted, the "card" here, identified by the person employed in the records department of the jail in 1955, familiar with such admission procedure, and also by the person presently charged with keeping such records, included, in addition to the medical notation describing defendant's condition as good, certain other data relating to defendant's history, his picture, his fingerprints and the reason for his admission. It is also evident. that this "card" is kept pursuant to long standing practice and the statutory requirement that the warden keep an exact calendar of persons committed to jail, their place of abode, the time, cause and authority of their commitment, and "a description of the person," and the time and manner of discharge. Ill. Rev. Stat. 1967, chap. 75 ,par. 7.

Defendant's inmate history card was, therefore, considerably more than the diagnostic medical record intended to be excluded without doctor identification by the Supreme Court rule. In fact the medical portion is essentially descriptive of the prisoner's appearance, and in view of the contents, mode of preparation and purport, the card should not come within the purview of the medical records exclusion. Quite the contrary, the same justification exists here for admitting the card as exists for records made in the regular course of business. (*People* v. *Small,* 319 Ill. 437; *Secco* v. *Chicago Transit Authority,* 6 Ill. App. 2d 266, 269.) In the *Secco* case that justification was explained at pp. 269-70: "It [the rule] was intended to make unnecessary the original entrants' production at the trial because of their numbers or anonymity, or for reasons which made their production impracticable * * *. It was intended to be sufficient, if the custodian of the records, or some person familiar with the business and its mode of operation, would testify at the trial as to the manner in

which the record was prepared, * * *. 5 Wigmore on Evidence (3d ed. 1940) p. 391."

It is our view, therefore, that defendant's county jail inmate card was properly admitted in evidence; and furthermore, since the medical notation was merely cumulative evidence refuting the alleged physical coercion, the admission of the card should not be deemed reversible error.

Defendant contends also that the admission of the testimony of Officer Charles in the earlier trial was reversible error, even though it was stipulated that Charles was dead at the time of his hearing. The record is clear that Charles's testimony had been subjected to competent cross-examination by defendant's counsel at the prior hearing. Although the parties in that prior trial included DeSoto Allen, nevertheless Charles's testimony related to his contact with this defendant to whom he had been assigned; and the issue upon which Charles was cross-examined was the same as in the instant case, *i.e.,* whether he forced defendant to confess by beating.

The law requires only substantial identity of issues and parties where prior testimony of a deceased witness is introduced at a subsequent proceeding. (McCormick, Evidence (1954), 487-490; 5 Wigmore, Evidence (3d ed. 1940), 82, 83), and identity of counsel in both proceedings is not a condition of admissibility.

We find *McInturff* v. *Insurance Co. of North America,* 248 Ill. 92, cited by defendant, a more persuasive authority for admitting rather than rejecting Charles's testimony here, in view of the criteria set forth by the court at page 95: "As to the parties, all that is essential is that the present opponent should have had a fair opportunity of cross-examination. Consequently a change of parties which does not affect such a loss does not prevent the use of the testimony."

Under our analysis of the issues presented on this appeal, the decision of the trial court on the voluntariness of the confession was amply supported by the evidence, and

there was no reversible error in the conduct of that hearing. The decision of the circuit court permitting the conviction to stand is, therefore, affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part is the consideration or decision of this case.