THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD SIZEMORE, Defendant-Appellant.

First District (2nd Division)    No. 79-1952

Opinion filed June 30, 1981.

Judith A. Halprin, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Stein, and Thomas G. DiCianni, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Donald Sizemore, was charged by indictment with burglary. (Ill. Rev. Stat. 1977, ch. 38, par. 19—1.) In a bench trial defendant was found guilty and was sentenced to serve 5½ years in the Illinois Department of Corrections. On appeal defendant contends that the trial court erred in denying defendant's motion to suppress his confession and that he was not proven guilty beyond a reasonable doubt. For the reasons hereinafter set forth we affirm the judgment of the circuit court of Cook County.

Prior to trial defendant moved to quash his arrest and to suppress a two-page typewritten confession he gave to the police. In his confession defendant admitted his participation in the October 26, 1978, burglary at the Chez Paul restaurant located at 660 North Rush Street in Chicago.

In support of his motion defendant testified that between 9 and 10 p.m. on October 29, 1978, he was arrested in the lobby of the Ohio East Hotel, 19 East Ohio Street, by two plainclothes police officers whom he did not know. Defendant was transported in handcuffs to the police station at Belmont and Western. En route the officers, who did not advise defendant of his *Miranda* rights, asked defendant where he had obtained a stolen CB radio which he had in his possession. Upon arriving at the station, defendant's handcuffs were removed and he was locked into a small room where he fell asleep.

Defendant testified that he was kicked awake by burglary investigator James Biebel who said, "What do we have here?" Biebel's partner, James Jones, was also present. Defendant knew both officers from prior arrests and testified that they had beaten him on those occasions. The investigators moved defendant into a larger office where Biebel handcuffed defendant's right arm to a chair. According to defendant Biebel asked him if he wanted "to do it the hard way or the easy way."

Defendant gave him the name, address and telephone number of his employer and asked Biebel to call and verify defendant's whereabouts at the time of the burglary (6:10 a.m., October 26, 1978). Biebel refused and told defendant, "We've been through this before and we can go through it again. Make it easy on yourself." At this point investigator Jones grabbed defendant by his shirt and said, "Let me take care of this. He's going to be a hard ass, I'll handle this, * * *." Biebel asked defendant to whom he wanted to talk—Biebel or Jones. Defendant persisted in asking the officers to call his employer.

Defendant testified that when he asked to speak with an attorney, Biebel said that he (Biebel) would act as his attorney and that any statements defendant gave probably could not be used against him. Jones, who was standing behind defendant, grabbed a Chicago telephone directory and started hitting defendant on top of his head. Defendant tried to ward off the blows with his one free hand but one of the officers immediately secured that hand to the chair. Defendant stated that Jones struck him four or five times.

One of the officers advised defendant that if he signed a statement the officer would take him downstairs to the lockup. Both investigators informed defendant that the other person arrested for the burglary, Engel Semesedinovski, had signed a statement implicating defendant. They showed the statement to defendant and he read it. Defendant pleaded with the officers to call his employer, but they refused.

Jones and Biebel then acted like they were having an argument. Biebel told Jones to leave the room. During the 15 minutes Jones was gone, Biebel suggested to defendant that he should "do it [i.e., confess] the easy way." Biebel advised defendant to talk to him or else Biebel would let Jones come back. According to defendant, Biebel said, "He [Jones] don't like you anyway." Biebel refused to call defendant's employer because he already had Semesedinovski's statement in which he implicated defendant. Semesedinovski had been defendant's co-arrestee in 1974.

Defendant stated that Jones came back into the room and asked Biebel how he was doing. Biebel said, "Looks like he wants to be a hard ass." Jones stepped behind defendant and hit him with the telephone book each time defendant gave the "wrong answer" to Biebel's questions. Defendant said he was struck more than 10 times. Biebel then reached down, grabbed defendant's testicles and started squeezing them until defendant hollered. Defendant kept asking Biebel to call his employer and said that he had three persons who could verify his whereabouts. Pointing to Semesedinovski's statement, Biebel said, "This is all the proof we need."

Defendant testified further that investigator Jones walked around to

the front of defendant, pulled a knife out of his right coat pocket and held it to defendant's neck. Jones said, "I'm not going to play all the games Jim [Biebel] is going to play with you. You're going to do it my way because I'm not going to be here all night long." Defendant then agreed to give a statement. Biebel left and returned 10 to 15 minutes later with a statement he told defendant to sign. Defendant's handcuffs were removed from the chair so that he could sign. Defendant pretended to read it and then signed the second page. Two other police officers came into the interview room and Biebel said, "There you go," throwing the signed statement onto a desk. As Biebel and Jones left, Biebel told the other officers, "If you have any more problems we'll be back." Defendant testified that he signed the statement at 2 a.m. on October 30, 1978.

On cross-examination defendant admitted that in his signed motion to suppress there was no mention of investigator Jones holding a knife to his throat. Defendant also admitted that on the prior occasions when Jones and Biebel had beaten him with their hands, he made no complaint and did not move to suppress the statements given. Defendant expressed familiarity with his *Miranda* rights.

Defendant testified further that when he was at the station and before he was beaten, he went through a large number of burglary files and pulled out 11 case reports. Defendant told Biebel and Jones that he and Semesedinovski were responsible for those 11 burglaries. All involved taverns or restaurants and all occurred at approximately the same time of day.

Defendant did not complain of the beating to either of the two officers who came into the room after defendant signed his statement. Nor did he complain to anyone at the jail. He was not hospitalized. Defendant did not name the attorney with whom he wanted to speak. Defendant stated that Biebel had squeezed defendant's testicles 10 or 15 times. In court defendant identified Semesedinovski's statement as the one which had been shown to him during his interrogation.

On redirect, defendant testified that no officer signed his name as a witness to defendant's statement in defendant's presence. Biebel and Jones brought in a large number of burglary case files and asked defendant to pick out ones with the same method of operation defendant and his partner, Semesedinovski, had been known to use. Biebel said he wanted to clean up his files. Defendant selected a number of files and claimed responsibility for the burglaries even though some had occurred while he was in the penitentiary. From prior experience, defendant thought that this would satisfy Biebel so that he would not beat him. Defendant testified that he told his parole officer, Shelby Rowe, what had happened to him. He then rested on the motion.

The State called five witnesses in opposition. Officer Michael Cronin

testified that he and Lieutenant Wadnicki arrested defendant at the Ohio East Motel for burglary. Cronin said that he advised defendant of his *Miranda* rights, then drove him to Belmont and Western where defendant was placed in a small 12 foot by 8 foot room on the second floor.

Investigator Biebel testified that on October 28, 1978, he and investigator Jones worked from 4:30 p.m. to 1 a.m. Toward the end of his shift, Biebel received a call to report to the station. Upon arrival, Lieutenant Wadnicki informed Biebel that defendant was in his office. Biebel knew defendant from previous burglary investigations and testified that in 1974 he had agreed to help defendant get a sentence of probation in return for defendant's cooperation in reviewing Biebel's open burglary files and identifying those which he had committed. Biebel denied that either he or Jones ever beat defendant on those occasions.

According to Biebel, defendant was not handcuffed when he spoke with him on October 29. In response to a question from Biebel, defendant stated that he had been advised of his constitutional rights. Defendant related certain details about the burglary to Biebel and Jones and agreed to give a statement to the officers who worked the midnight shift. Biebel stated that he did not know all the particulars of the Chez Paul burglary and did not question defendant at length. Investigator Raymond Gawne came into the station, and Biebel told him that defendant would make a statement.

Biebel stated that he did not kick defendant or grab his testicles and that he never saw Jones strike defendant with a telephone book or threaten him with a knife. Defendant did not ask Biebel to call his employer because defendant had told him that he had not been working for a week. Biebel never took a statement from defendant and did not prepare a written report because he was not assigned to the case. Defendant went through a burglary "MO" (*modus operandi*) book with Jones, but Biebel did not know if defendant assumed responsibility for any of the burglaries.

Investigator Gawne testified that he was assigned to investigate the burglary of the Chez Paul restaurant. On October 29 he arrived for duty at 12:15 a.m. Investigator Jones told him that defendant was in custody and had agreed to give a statement.

Before the statement was taken, Gawne and Jones asked defendant to go through a stack of unsolved burglary case reports. Defendant picked out 11 and said that he had committed them. Defendant's confession to these burglaries was not included in defendant's written statement and, on the advice of the assistant state's attorney in felony review, defendant was charged with only the Chez Paul burglary. Gawne never memorialized defendant's confession to the other burglaries or referred to them in his police reports of the Chez Paul burglary.

Defendant did not complain to Gawne about any bodily injury or say that he had been beaten. Gawne observed no bruises or bleeding and said that defendant was not crying. Gawne said that he typed out questions, asked defendant the questions, then typed his responses. Investigator John Azara was present for this questioning. In defendant's presence Gawne signed defendant's statement as a witness.

Investigators Jones and Azara testified and reiterated the accounts of defendant's arrest and interrogation previously given by Biebel and Gawne. Jones said that he did not see Biebel kick defendant or squeeze his testicles. Jones did not handcuff defendant to a chair, hit defendant with a telephone book or place a knife to his throat. Defendant went through a number of burglary reports and selected 11 which he said he had committed. These admissions were not put into defendant's statement or in any police report. Jones testified that defendant confessed first to Biebel and himself. They were called in to see defendant because Lieutenant Wadnicki knew they had a "good rapport" with defendant from their prior arrests and interrogations. Jones testified that no court reporter statement was taken from defendant and that defendant's admissions to the unrelated burglaries were not reduced to writing or placed in Jones' reports. Jones did not take notes of defendant's confession to the Chez Paul burglary or refer to the confession in any written report.

The trial court ruled that the statement of defendant's co-arrestee, Engel Semesedinovski, established probable cause to arrest defendant. The court also found that based on its observations of defendant and the other witnesses testifying under oath, it did not believe that defendant was telling the truth. Having found defendant was not physically or psychologically coerced into confessing his involvement in the burglary, the trial court denied defendant's motion to suppress his confession.

At trial the parties stipulated that on October 26, 1978, William Contos was the owner of the Chez Paul restaurant located at 660 North Rush Street in Chicago. At 6 a.m. on that date no one but Contos' employees had permission to enter the restaurant. Defendant and Semesedinovski were not employees and neither had permission to enter or remove property from the restaurant.

Oselvido R. Conill, the assistant manager of Chez Paul, testified that he arrived at work approximately at 6 a.m. on October 26, 1978. Two other employees were waiting for him to open the restaurant. When Conill unlocked the door and stepped inside, he saw a man (Semesedinovski) approaching him and told him to stop. Conill and the other employees apprehended him and held him until the police responded. Conill asked Semesedinovski how he had gained entrance and Semesedinovski pointed to a broken window on the side of the restaurant facing

an alley. The window was four feet above the ground and there was a garbage can near the window on the outside. The window was not barred. There was also a metal door to the restaurant secured by bars and padlocks. The office had been broken into and the cash register drawer opened. There were papers strewn all over the floor of the office and the manager's briefcase was missing. Conill identified the briefcase when it was recovered.

Investigator Raymond Gawne testified that he went to the burglarized restaurant on October 26, 1978, and found Engel Semesedinovski in custody. Gawne spoke with Semesedinovski, then searched the area for defendant. After defendant had been arrested by other officers, Gawne took his statement, which he published to the jury.

In his written statement defendant admitted assisting Semesedinovski in burglarizing the Chez Paul restaurant at approximately 6:10 a.m. on October 26, 1978. Defendant and Semesedinovski were shooting pool at the Radio Grill at Grand and Rush when Semesedinovski told defendant that he wanted to burglarize Chez Paul. Defendant agreed to assist him. Whey they arrived at the restaurant, Semesedinovski told defendant he needed help in prying open a bar. Defendant pried the bar, and Semesedinovski went inside looking for money. Semesedinovski returned to the window and handed a briefcase and a radio to defendant who set them on the ground in the alley.

Defendant told Semesedinovski to come out but he refused, saying that he was sure that there was money inside the restaurant. Defendant became scared and left without the case or the radio. After a few minutes, defendant saw a squad car arrive at the restaurant and he assumed that they were there for Semesedinovski. In his statement defendant told the officers that he pried a bar open with his hands and cut a screen mesh with his foot. Semesedinovski was inside for approximately 45 minutes. Defendant could not go inside himself because the hole was too small. Semesedinovski and defendant had agreed to split the proceeds 50-50.

In defense Semesedinovski testified that he was serving time in the Department of Corrections following his plea of guilty to the burglary of Chez Paul. Semesedinovski admitted that he had given a statement to the police implicating defendant, but denied that defendant was with him at the time of the burglary. Semesedinovski testified that he had fabricated the story because the police slapped him when he denied that defendant was with him. Semesedinovski was also of the impression that defendant had "beefed" on him on a prior occasion. He believed that he could avenge himself and avoid any further beatings if he incriminated defendant in the burglary. According to Semesedinovski, the police threatened to beat him to death if he did not implicate defendant.

Semesedinovski admitted that he knew defendant, had worked with him and had committed two prior burglaries with him. He stated that he gained entrance to the restaurant by going through the back door which he said was open. He was inside for only 10 to 15 minutes.

Semesedinovski admitted further that when he pleaded guilty he indicated in response to questions posed by a prosecutor that defendant had participated in the burglary. At trial he explained that he thought the assistant state's attorney had been inquiring about his statement to the police. Semesedinovski related two occasions after his plea was taken when he denied that defendant had been involved in the burglary.

Defendant took the stand in his own defense and denied that he participated in the Chez Paul burglary. Defendant testified that at the time of the burglary he was working at Ugly's Doughnut Shop at 2552 Pulaski. The owner was Angelo William Gasdiel. Defendant lived with the owner's brother, Michael Gasdiel. Defendant usually worked from 10 p.m. to 6 a.m., but on October 25, 1978, he started at 9 p.m. and stayed at the shop until 6:45 or 7 a.m. on October 26, discussing inventory and the night's events with the owner.

On direct examination defendant testified to substantially the same facts surrounding the circumstances of his confession as he had related on the motion to suppress, with one exception. On the motion defendant said that when investigator Jones pressed a knife to his throat, he said, "I'm not going to play all the games Jim [Biebel] is going to play with you. You're going to do it my way because I'm not going to be here all night long." At trial defendant testified that Jones said, "I'm going to cut your throat." Defendant admitted that he had two prior convictions for burglary and was currently on parole.

On cross-examination defendant named Jones and not Biebel as the officer who had squeezed his testicles four or five times. According to defendant, Jones and Biebel, not Gawne and Azara, suggested the details of his confession.

Angelo William Gasdiel, the former owner of Ugly's Doughnut Shop, and his brother Michael corroborated defendant's alibi. At the time of trial Angelo Gasdiel was serving a 30- to 90-year sentence for murder. Michael Gasdiel said that he was a friend of defendant and had shared an apartment with him.

Shelby Rowe, defendant's parole officer, corroborated defendant's testimony that on October 30, 1978, defendant had complained to Rowe that he had been beaten by the police. Rowe observed no physical evidence of defendant having been beaten and did not report the incident to any correction department officials.

At the conclusion of the case the State and defendant stipulated that

if investigators Biebel, Jones, Gawne and Azara, and Officer Cronin, were called to testify, they would testify as they had upon the motion to suppress.

The trial court found defendant guilty and sentenced him to serve 5½ years in the penitentiary.

## I

Defendant contends that the trial court erred in denying his motion to suppress his confession. In the case at bar defendant testified that he was never advised of his *Miranda* rights and that investigators Biebel and Jones coerced a false confession from him by beating him and threatening him with a knife. These allegations were denied by the officers. After hearing the witnesses testify and observing their demeanor under oath, the trial court found that the defendant was not telling the truth and that there was no evidence of physical or psychological coercion. Defendant now asks us to reverse that finding. We decline to do so.

Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) The voluntariness of a confession need be shown only by a preponderance of the evidence. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; *People v. Jackson* (1968), 41 Ill. 2d 102, 109, 242 N.E.2d 160; *People v. Perez* (1979), 72 Ill. App. 3d 790, 795, 391 N.E.2d 456; Ill. Ann. Stat., ch. 38, par. 114—11(d) Committee Comments (Smith-Hurd 1970).) A trial court's determination that a defendant confessed voluntarily will not be disturbed on appeal unless that determination is contrary to the manifest weight of the evidence. (*Prim*, at 70.) Defendant has failed to show that the trial court's ruling was against the manifest weight of the evidence. He has merely reiterated arguments regarding the evidence previously presented to the trial court.

Defendant contends that his testimony on the motion to suppress should have been believed and that the testimony of the State's witnesses was implausible. As we have indicated, the credibility of all the witnesses, including defendant, was a matter for the trial court to decide. We will briefly address the evidence defendant finds unbelievable.

Defendant states that none of the State's witnesses explained how defendant was moved from the small office where Officer Cronin left him to Lieutenant Wadnicki's office. Investigator Biebel, however, testified that Wadnicki informed him that defendant was in his (Wadnicki's) office. That Officer Cronin did not move defendant did not mean that Wadnicki or some other officer could not have moved defendant into the lieutenant's office before Biebel and Jones arrived at the station. While

defendant complains that the State failed to produce Lieutenant Wadnicki at the hearing, the State did offer to continue the case until Wadnicki returned from a training course at the FBI academy in Quantico, Virginia. The trial court found that Wadnicki was not a material witness and declined to continue the case.

■■ When the voluntary nature of a confession is brought into question by a motion to suppress, the State must produce all material witnesses connected with the taking of the statements or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, 282 N.E.2d 712.) In the case at bar there was no evidence that Wadnicki played a role in procuring defendant's confession or was present when the confession was taken. Under these circumstances Wadnicki was not a material witness and the State was not required to produce him at the suppression hearing or explain his absence. (See *In re Lamb* (1975), 61 Ill. 2d 383, 390, 336 N.E.2d 753.) The mere fact that Wadnicki was present when defendant was arrested did not make him a material witness. *People v. Glanton* (1975), 33 Ill. App. 3d 124, 140, 338 N.E.2d 30.

Defendant finds it incredible that Biebel and Jones would go into the station for the sole purpose of interrogating defendant on a burglary case to which they were not assigned. There was testimony, however, that Biebel and Jones had a special rapport with defendant and that this rapport might assist the officers assigned to the case in obtaining a statement from defendant. Although neither Biebel nor Jones made a report of defendant's confession, neither was assigned to the case.

Biebel testified that he did not call defendant's employer, since defendant told him he had been out of work for a week. Defendant now asserts that "it is patently incredible that a man under police questioning would say he was unemployed when in fact he had a job." This assumes, of course, the truth of defendant's representation.

Defendant also points to the fact that the police did not charge defendant with any of the 11 unrelated burglaries to which he confessed. Uncontradicted testimony, however, established that no other charges were filed on the advice of the felony review assistant state's attorney. Defendant finds "incredible" and "insulting to the intelligence of the receiver" investigator Gawne's testimony that he omitted reference to defendant's confessions to the unrelated burglaries from defendant's statement and never memorialized them. Defendant's confessions to unrelated burglaries, however, were not germane to the statement. Although the investigator's failure to record the confessions in any report does not appear to be good police practice, we find nothing in the testimony of the State's witnesses inherently incredible or "contrary to human experience."

Defendant's allegations of physical and psychological coercion were denied by all of the officers involved in defendant's interrogation. At oral

argument defendant asserted that "the lack of police corroboration doesn't mean that the citizen's complaint is incredible." In *People v. Jackson* (1968), 41 Ill. 2d 102, 112, 242 N.E.2d 160, the supreme court noted that "[a]lthough numerical superiority of policemen testifying to the propriety of official conduct cannot be deemed determinative that a confession is voluntary, neither does the mere assertion that a confession was elicited by physical beatings establish *per se* that the confession is involuntary." In the case at bar defendant's account of how his confession was obtained was not only denied by the officers but also was materially impeached on cross-examination.

Defendant claimed that both Officers Biebel and Jones had "beaten" confessions from him on prior occasions. Yet defendant filed no motion to suppress those confessions and never complained of what purportedly had happened. In the case at bar defendant expressed no complaint to either Officer Gawne or Officer Azara nor did defendant mention the incident to anyone at the jail. Defendant waited until he met his parole officer before he first voiced his complaint. Although defendant testified that investigator Jones threatened him with a knife, defendant's motion to suppress failed to raise that allegation.

At trial defendant testified to a version of events surrounding his confession which, in certain significant respects, was inconsistent with his testimony on the motion to suppress. On the motion defendant testified that investigator Biebel had squeezed defendant's testicles a total of 10 or 15 times. At trial defendant testified that investigator Jones had done this four or five times. On the motion defendant claimed that when Jones threatened him with a knife, he said, "I'm not going to play all the games Jim [Biebel] is going to play with you. You're going to do it my way because I'm not going to be here all night long." At trial defendant testified that Jones had said, "I'm going to cut your throat." In determining whether the trial court properly admitted defendant's confession into evidence, we may consider all the evidence, introduced both at the hearing on the motion and at trial. *People v. McClure* (1976), 43 Ill. App. 3d 1059, 1061, 358 N.E.2d 23.

■■ Upon a review of the evidence presented in this case, we conclude that the trial court's ruling on the admissibility of defendant's confession was not contrary to the manifest weight of the evidence.

## II

Defendant also contends that even if his confession was properly admitted into evidence, his guilt was not established beyond reasonable doubt. Defendant argues that because he repudiated his confession at trial, presented witnesses whose testimony corroborated his repudiation and established an alibi defense, he was not proven guilty beyond a reasonable doubt.

■■ The trial court was not obligated to accept defendant's repudiation of his confession. Defendant, however, points to certain inconsistencies between the details of his confession and the facts of the burglary as related by the assistant manager of the restaurant, Oselvido Conill. In his statement defendant said that he had pried open a bar with his hands and had cut through a screen with his foot. Conill testified that Semesedinovski indicated that he had entered through a broken window. The window was not barred. Conill also testified, however, that there was a metal door to the restaurant which was usually secured by bars and padlocks. While Conill did not state whether the bars had been pried or whether either the door or the window was screened, we do not believe that the absence of testimony on these facts creates any irreconcilable inconsistencies with the facts as related in defendant's confession. Although the only evidence connecting defendant to this crime was his confession, there was evidence *aliunde* the confession which proved the *corpus delicti* of burglary. So long as the *corpus delicti* is proved, a confession tending to show that the defendant committed the crime will justify a conviction. *People v. Taylor* (1974), 58 Ill. 2d 69, 78, 317 N.E.2d 97.

In support of his repudiation, defendant cites the testimony of Engel Semesedinovski, who attempted to exonerate defendant. Semesedinovski also prepared and signed an affidavit in which he denied that defendant was involved in the burglary. The trial court, however, found Semesedinovski's testimony unbelievable and stated that Semesedinovski had been "thoroughly impeached." In light of the cross-examination of Semesedinovski, the details of which we have set out earlier in this opinion, we cannot say that the trial court's evaluation was erroneous.

Defendant also relies on the alibi testimony presented by his former employer, Angelo Gasdiel, and defendant's co-worker, Michael Gasdiel. The credibility of these witnesses, however, was called into question by their bias. Moreover, Angelo Gasdiel was impeached by his admission that subsequent to the Chez Paul burglary he had been convicted of murder.

■■ The credibility of the witnesses was to be determined by the trial court sitting as the trier of fact. That determination will not be reversed unless it is palpably wrong. Upon our examination of the record, we find that there was ample evidence to establish defendant's guilt beyond a reasonable doubt. Accordingly, the judgment of the circuit court of Cook County finding defendant guilty of burglary is affirmed.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.